No. 25-10703

In the United States Court of Appeals
for the Fifth Circuit

---

**American Airlines, Incorporated**,
*Plaintiff – Appellant/Cross-Appellee*

v.

**Skiplagged, Incorporated**,
*Defendant – Appellee/Cross-Appellant*

---

Appeal from the United States District Court for the Northern
District of Texas, Fort Worth Division; Civil Action No. 4:23-cv-860
*Honorable Mark Timothy Pittman, Judge Presiding*

---

## SKIPLAGGED, INCORPORATED'S MOTION FOR LEAVE TO FILE CORRECTED BRIEF AS APPELLEE AND OPENING BRIEF AS CROSS-APPELLANT

---

David S. Coale
State Bar No. 00787255
dcoale@lynnllp.com
**Lynn Pinker Hurst &
Schwegmann LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214)-981-3800
Facsimile:  (214)-981-3839

**ATTORNEYS FOR SKIPLAGGED, INCORPORATED,
APPELLEE / CROSS-APPELLANT**

TO THE HONORABLE FIFTH CIRCUIT COURT OF APPEALS:

Pursuant to Federal Rule of Appellate Procedure 27 and Fifth Circuit Rule 27, Appellee Skiplagged, Incorporated ("Appellee") respectfully moves for leave to file a corrected version of its Brief as Appellee and Opening Brief as Cross-Appellant (the "Brief"). This motion is unopposed. In support, Appellee states as follows:

1. On February 9, 2026, Appellee filed its Brief [Doc 94] and then a corrected Brief [Doc. 95] in the above-captioned appeal.

2. After filing, Appellee discovered that the corrected brief was, in fact, an earlier version of the document rather than the final version. Several pinpoint cites needed to be filled in, and one statement in the fact section needed to be corrected.

3. The proposed corrected brief does not alter any substantive argument, authority, or position presented in the original filing. The corrections are limited to (1) filling in the blank pinpoint cites, (2) correcting a statement in the fact section, and (3) at the request of American's counsel, removing certain case parentheticals to bring the corrected brief within the word limit. No argument or case citation was added or removed.

4. Counsel for Appellant, American Airlines, Incorporated, has been consulted regarding this motion and does not oppose the requested relief.

5. Granting this motion will not prejudice any party or delay the proceedings before this Court. The substantive arguments remain unchanged.

Appellee is filing the corrected brief contemporaneously with this motion in accordance with the Court's CM/ECF procedures.

## CONCLUSION

For these reasons, Appellee Skiplagged, Incorporated respectfully requests that the Court grant this Unopposed Motion for Leave to File Corrected Brief as Appellee and Opening Brief as Cross-Appellant. Appellee further requests all additional relief to which it may be justly entitled.

Respectfully submitted,

*/s/ David S. Coale*

David S. Coale
  State Bar No. 00787255
  dcoale@lynnllp.com
**Lynn Pinker Hurst &
  Schwegmann, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile:　(214) 981-3839

**ATTORNEYS FOR SKIPLAGGED,
INCORPORATED, APPELLEE/
CROSS-APPELLANT**

## Certificate of Service

The undersigned certifies that a copy of the foregoing has been served upon counsel of record on March 2, 2026.

Dee J. Kelly, Jr.
dee.kelly@kellyhart.com
Caitlyn E. Hubbard
caitlyn.hubbard@kellyhart.com
Julia G. Wisenberg
julia.wisenberg@kellyhart.com
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

R. Paul Yetter
pyetter@yettercoleman.com
Tyler P. Young
tyoung@yettercoleman.com
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

**Attorneys for Appellant American Airlines, Incorporated**

*/s/ David S. Coale*
David S. Coale

## Certificate of Conference

The undersigned certifies that counsel for Skiplagged, Incorporated conferred with Caitlyn Hubbard, counsel for Appellant American Airlines, Incorporated, on February 26 and 27, 2026, and the relief requested by this Motion is not opposed.

*/s/ David S. Coale*
David S. Coale

## Certificate of Electronic Compliance

I hereby certify that, in the foregoing motion filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by the Fifth Circuit Rule 25.2.13 have been made, (2) the electronic submission is an exact copy of the paper document, and (3) the document has been scanned for viruses and is free of viruses.

*/s/ David S. Coale*
David S. Coale

No. 25-10703

**In the**
**United States Court of Appeals**
**for the Fifth Circuit**

**American Airlines, Inc.,**
*Appellant,*

**v.**

**Skiplagged, Inc.,**
*Appellee.*

Appeal from the United States District Court
for the Northern District of Texas
*Hon. Mark Pittman, District Judge*

**Skiplagged's Amended Response Brief as Appellee**
**and Opening Brief as Cross-Appellant**

Aaron Z. Tobin
  Texas Bar No. 24028045
   atobin@condontobn.com
Brandy R. Manning
  Texas Bar No. 24029703
   bmanning@condontobn.com
**Condon Tobin Sladek**
**Thornton Nerenbeg, PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
P: 214-265-3800
F: 214- 691-6311

David S. Coale
  Texas Bar No. 0078725
   dcoale@lynnllp.com
**Lynn Pinker Hurst &**
**Schwegmann, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
P: 214-981-3800
F: 214-981-3839

*Counsel for Skiplagged, Inc.*

# Identity of Parties and Counsel

Counsel of record certifies that the following persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.2 have an interest in the outcome of this case. Those representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| *Plaintiff, Appellant, and Cross-Appellee:* | *Counsel for American Airlines:* |
| American Airlines, Inc. | Dee J. Kelly, Jr.<br>Caitlyn E. Hubbard<br>Julia G. Wisenberg<br>Kelly Hart & Hallman LLP |
| | R. Paul Yetter<br>Tyler P. Young<br>Yetter Coleman LLP |
| | Cameron M. Nelson<br>Greenberg Traurig LLP |
| *Defendant, Appellee, and Cross-Appellant:* | *Counsel for Skiplagged:* |
| Skiplagged, Inc. | William Louis Kirkman<br>Kirkman Law Firm, P.L.L.C. |
| | Aaron Zachary Tobin<br>Brandy Renee Manning<br>Leah K. Lanier<br>Abigail R.S. Campbell<br>Condon Tobin Sladek Thornton<br>Nerenberg, P.L.L.C. |
| | David Coale, Lynn Pinker Hurst &<br>Schwegmann, LLP |
| | */s/ David S. Coale*<br>David S. Coale |

## Statement Regarding Oral Argument

Skiplagged never bought or resold any American ticket. It published truthful pricing information and referred users to American's website, where American made the sales directly to the customers—over $200 million worth.

American cannot plausibly sue Skiplagged for accurately informing the public and driving revenue to American. Oral argument would help the Court examine the full record and applicable law showing why American's claims are meritless.

# Table of Contents

Identity of Parties and Counsel ..................................................................2

Statement Regarding Oral Argument ..........................................................3

Table of Contents ........................................................................................4

Index of Authorities ....................................................................................7

Issues Presented (as Appellee) ..................................................................14

Issues Presented (as Cross-Appellant) ......................................................15

Statement of the Case ................................................................................16

    I.    Substantive background ..........................................................16

    II.    Procedural history ....................................................................18

Summary of the Argument ........................................................................19

Argument as Appellee ................................................................................21

    I.    The district court correctly dismissed American's contract and tortious interference claims. ...........................................21

        A.    American's claims about "Use Agreements" between Skiplagged and American are time-barred. .........................................................................22

        B.    Alternatively, American's "Use Agreement" is unenforceable. ..........................................................28

        C.    American's tortious interference claim is time-barred and fatally defective. ........................................34

    II.    The district court correctly rendered judgment against American on its trademark claim based on the jury's finding of nominative fair use. ..............................................37

        A.    Skiplagged could assert nominative fair use. ...............38

B. Skiplagged presented sufficient evidence that its use of American's mark was necessary and appropriately limited.................................. 42

C. *Pebble Beach* does not establish a per se "prominence" rule. ..................................47

D. American's "first sale" argument is legally inapposite. ...............................................49

E. The jury reasonably rejected American's "implied endorsement" theory...................................50

III. The district court correctly credited the jury's finding about mitigation to reduce American's copyright damages..............52

A. The Copyright Act does not preclude mitigation as a limitation on damages..........................53

B. The jury weighed the conflicting evidence and reasonably determined that American failed to mitigate its damages.....................................55

Argument as Cross-Appellant .....................................................56

I. American did not establish personal jurisdiction over Skiplagged in Texas. ...........................................57

II. The district court erred in holding Skiplagged liable for copyright infringement.........................................67

III. American offered no evidence of damages for the relevant three-year period.................................................74

IV. American did not connect its claimed damages to the one act of copyright infringement that it alleged...............................75

A. American did not prove a causal connection between the alleged act of copyright infringement and any Skiplagged profits...........................76

5

B. American did not prove a causal connection between the alleged act of copyright infringement and any American lost profits................................... 82

C. The judgment contains impermissible double counting. .................................................................... 84

Conclusion...................................................................................85

Certificate of Service...............................................................87

Certificate of Compliance ......................................................88

# Index of Authorities

## Cases

*Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783 (5th Cir. 2021) .... 58, 59, 60

*Alpha Partners, Ltd. v. Safeway Ins. Co.*, No. 05-01-00313-CV, 2002 WL 14297 (Tex. App.—Dallas Jan. 7, 2002, pet. denied) ................................................................................. 29

*al-Suyid v. Hifter*, 139 F.4th 368 (4th Cir. 2025) .......................... 57

*Annis v. County of Westchester*, 136 F.3d 239 (2d Cir. 1998) ........................ 74

*Apulent, Ltd. v. Jewel Hospitality, Inc.*, No. C14–637RSL, 2015 WL 630953 (W.D. Wash. Feb. 12, 2025) ........................... 82

*Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520 (7th Cir. 2018) ................................................................ 59

*Barker v. Eckman*, 213 S.W.3d 306 (Tex. 2006) .......................... 27

*Barker v. Eckman*, 213 S.W.3d 360 (Tex. App.—Houston [1st Dist.] 2004) ....................................................................... 27

*Barrientos-Romero v. Bondi*, No. 25-60285, 2025 WL 3772151 (5th Cir. Dec. 31, 2025) ................................................ 28

*Bd. of Suprvs. for LSU v. Smack Apparel Smack Apparel Company*, 550 F.3d 465 (5th Cir. 2008) ..................................... *passim*

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313 (5th Cir. 2022) ..................................................................... 67

*Benson v. Double Down Interactive, LLC*, 798 F.App'x 117 (9th Cir. 2020) ................................................................ 31, 32

*BidPrime, LLC v. SmartProcure, Inc.*, 2018 U.S. Dist. LEXIS 180546 (W.D. Tex. 2018) ...................................................... 63

*Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000) ................. 38

*C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319 (10th Cir. 2019) ..................................................................... 57

*Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) ................................... 28

*Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 876 F.3d 119 (5th Cir. 2017) ................................................ 28

*Del Amo v. Baccash*, No. CV 07-663 PSG (JWJx), 2008 WL 2780978 (C.D. Cal. July 15, 2008) ................................................. 82

*DHI Group, Inc. v. Kent*, No. 21-20274, 2022 WL 3755782 (5th Cir. Aug. 20, 2022) ......................................................... 27

*Digitalway Servs., LLC v. Blue Ridge Healthcare*, 2023 U.S. Dist. LEXIS 85203 (N.D. Tex. 2023) ................................................ 65

*Dominguez v. Dominguez*, 583 S.W.3d 365 (Tex. App.—El Paso 2019, pet. denied) ............................................................... 37

*Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 476 F.App'x 190 (11th Cir. 2012) ...................................................... 79

*Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699 (Tex. 2021) ....... 22, 27

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020) ............................................ 54, 55

*Fagan v. Nexo Capital, Inc.*, No. 4:24-cv-466, 2025 WL 2446301 (E.D. Tex. Aug. 25, 2025) ............................................................ 33

*Goodner v. Hyundai Motor Co.*, 650 F.3d 1034 (5th Cir. 2011) ................... 76

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) ............................... 68, 80

*Graham v. Prince*, No. 15-CV-10160 (SHS), 2023 WL 5917712 (S.D.N.Y. Sept. 11, 2023) ........................................................... 77

*Heavy Duty Prods., LLC v. Band Wdth, LLC*, 2015 U.S. Dist. LEXIS 183124 (W.D. Tex. July 21, 2015) ...................................... 64

*Heavy Duty Prods., LLC v. Bandwdth, LLC*, 2015 U.S. Dist. LEXIS 62252 (W.D. Tex. 2015) ................................................. 64, 65

*HomeAdvisor, Inc. v. Waddell*, No. 05-19-00669-CV, 2020 WL 2988565 (Tex. App.—Dallas June 4, 2020, no pet.)........................ 31

*Honus Wagner Co. v. Luminary Grp. LLC*, 2017 U.S. Dist. Ct. LEXIS 210097 (S.D. Fla. 2017) ............................................................ 59

*Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686 (5th Cir. 2018) ........................... 29

*Hunt v. CheapCaribbean.com, Inc.*, No. 3:09-CV-0622-K, 2009 WL 10704881 (N.D. Tex. June 23, 2009) ......................................... 33

*Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762 (Tex. 1987) ................... 36

*I Dig Texas, LLC v. Creager*, 498 F.4th 998 (10th Cir. 2024) ..................... 82

*In re 24R, Inc.*, 324 S.W.3d 564 (Tex. 2010) ................................................. 29

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 903 F.3d 896 (9th Cir. 2018)................................................................................................... 57

*Inwood Nat'l Bank v. Fain*, 706 S.W.3d 342 (Tex. 2025) ........................... 36

*Janus v. Freeman*, 840 Fed App. 928 (9th Cir. 2020) ................................. 59

*John G. Mahler Co. v. Klein Karoo Landboukooperasie DPK*, 1995 WL 371037 (5th Cir. June 5, 1995)................................................... 28

*John v. City of San Antonio*, Civil No. SA–07–CA–380–FB, 2007 WL 9706474 (W.D. Tex. July 24, 2007)......................................... 35

*Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894 (9th Cir. 2006) ....................................................................................... 27

*Johnson v. TheHuffingtonpost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021)................................................................................................... 61

*Johnston v. Kroeger*, No. 1:20-cv-00497-RP, 2022 WL 3703859 (W.D. Tex. Aug. 26, 2022) ...................................................................74

*Jones v. Homeaglow Inc.*, No. 3:25-CV-00249-S, 2025 WL
2816792 (N.D. Tex. Oct. 1, 2025) ......................................30

*Kagan v. Nexo Cap. Inc.*, No. 4:24-CV-466, 2025 WL 2446301
(E.D. Tex. Aug. 25, 2025) ............................................... 31

*Keck v. Mix Creative Learning Ctr., L.L.C.*, 116 F.4th 448 (5th
Cir. 2024) ........................................................... 72, 73

*Latshaw v. Johnston*, 167 F.3d 208 (5th Cir. 1999)....................................58

*Leland Med. Centers, Inc. v. Weiss,* No. 4:07CV67, 2007 WL
2900599 (E.D. Tex. Sept. 28, 2007)................................. 84

*Leonard v. Stemtech Health Sci., Inc.*, No. 08–067–LPS–CJB, 2011
WL 6046701 (D. Del. Dec. 5, 2011)................................. 82

*Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642 (Tex. 1994)................29

*Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006)...............58

*Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002)..................................... 81, 83

*Maharishi School of Vedic Science v. Olympus Real Estate*, No. 05-
01-00140-CV, 2002 WL 1263894 (Tex. App.—Dallas June
7, 2002, pet. denied) ................................................29, 30

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*,
988 F.2d 587 (5th Cir. 1993)...........................................49

*McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89
(5th Cir. 1995) .......................................................... 24

*McFadin v. Gerber*, 587 F.3d 753 (5th Cir. 2009)......................................58

*MGE UPS Systems, Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d
361 (5th Cir. 2010) ........................................................77

*Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000)..............................81

*Mitchell v. Bailey*, 982 F.3d 987 (5th Cir. 2020) ........................................58

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258 (5th Cir. 2011)............................................................................30

*PAR Microsystems, Inc. v. Pinnacle Devel. Corp.*, 995 F.Supp. 658 (N.D. Tex. 1998)........................................................ 76, 82, 83

*Parker v. Winwood*, 938 F.3d 833 (7th Cir. 2019) ..........................................59

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir. 1988) ............ 47, 48

*Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214 (5th Cir. 2012) ...............................................................................66

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 672 (2014)......... *passim*

*Ramirez v. Freddie Records, Inc.*, No. H-08-801, 2009 WL 10694831, at \*5 (S.D. Tex. Sept. 10, 2009).....................................74

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)....................52

*Regency Field Services, LLC v. Swift Energy Operating*, 622 S.W.3d 807 (Tex. 2021) ....................................................................35

*Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492 (Tex. 1991)............... 24

*Roehrs v. Conesys, Inc.,* No. Civ.A. 3:05–CV–829–M, 2005 WL 3454015 (N.D. Tex. Dec. 14, 2005)................................................35

*Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (3d Cir. 1997)....................75

*Sayers Constr., L.L.C. v. Timberline Constr. Inc.*, 976 F.3d 570 (5th Cir. 2020) .....................................................................64

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004) ............................................................................ *passim*

*Sec. & Exch. Comm'n v. Gastauer*, 93 F.4th 1 (1st Cir. 2024)......................57

*Sheet Pile, LLC v. Plymouth Tube Co.*, 98 F.4th 161 (5th Cir. 2024)..... *passim*

*SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*, 681 F.Supp.3d 1181 (D. Utah 2023) ...................................................... 82

*Southwest Airlines Co. v. BoardFirst, LLC*, No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ......................... 33, 34

*Straus v. DVC Worldwide, Inc.,* 484 F.Supp. 2d 620 (S.D. Tex. 2007) ...................................................................................................77

*Streamline Prod. Systems, Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440 (5th Cir. 2017)...................................................................................38

*StubHub, Inc. v. Ball*, 676 S.W.3d 193 (Tex. App.—Houston [14th Dist.] 2023, no pet.) ......................................................... 30, 31

*Tex. Disposal Landfill, Inc. v. Waste Mgmnt. Holdings, Inc.*, 219 S.W.3d 563 (Tex. App.—Austin 2007, pet. denied)........................37

*Texas Soccer Foundation v. Sting Soccer Foundation*, No. 05-19-01228-CV, 2021 WL 4451439 (Tex. App.—Dallas Sept. 29, 2021, pet. denied)...................................................................29

*U.S. Money Rsrv., Inc. v. Kagan*, No. A-18-CV-577-LY, 2019 WL 1313469 (W.D. Tex. Jan. 29, 2019)............................................ 30, 33

*United Airlines, Inc. v. Zaman*, 152 F.Supp. 3d 1041 (N.D. Ill. 2015).................................................................................................62

*Vane v. The Fair, Inc.*, 849 F.2d 186 (5th Cir. 1988)............................. 80, 81

*Via Net v. TIG Ins. Co.*, 211 S.W.3d 310 (Tex. 2006) ............................... 22

*Volkswagenwerk AG v. Church*, 411 F.2d 350 (9th Cir. 1969) .......................39

*Walden v. Fiore*, 571 U.S. 277 (2014) ................................................. *passim*

*Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366 (2024) .................. 53, 54

*Wavetronix LLC v. Iteris, Inc.*, No. 6:21-CV-00899-ADA-DTG, 2022 WL 4211306 (W.D. Tex. Sept. 13, 2022)...............................27

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019)...................... 31, 32, 33

**Statutes**

17 U.S.C. § 504 ...................................................................................54

17 U.S.C. § 504(b) .................................................................75, 77, 84

Tex. Civ. Prac. & Rem. Code § 16.004(a)(3)............................................ 22

**Rules**

Fed R. App. P. 32(a)(7)(B)(iii) ..................................................... 88

Fed. R. App. P. 32(a)(6)................................................................ 88

Fed. R. App. P. 32(a)(7)(B)............................................................ 88

**Issues Presented (as Appellee)**

1.      Whether the district court correctly granted summary judgment on American's claim for breach of the "Use Agreement" about its website, because: (a) limitations bars that claim, when American knew of Skiplagged's alleged breach outside the limitations period, and (b) American did not establish Skiplagged's assent to the Use Agreement, when that "agreement" is not reasonably obvious because it is buried three pages deep in the American website, and does not actually commit American to do anything.

2.      Whether the district court correctly granted summary judgment on American's claim for tortious interference with its Conditions of Carriage, because:  (a) limitations bars that claim, as it rests on the same time-barred allegations as its claim about the Use Agreement, and (b) the Conditions of Carriage was not a "contract in existence" at the time of Skiplagged's alleged interference.

3.      Whether the district court correctly rendered judgment for Skiplagged on American's trademark claims based on the jury's finding of nominative fair use.

4.      Whether the district court correctly reduced American's copyright damages by the amount that the jury found American had failed to mitigate.

## Issues Presented (as Cross-Appellant)

1.      Whether American established that the district court had personal jurisdiction over Skiplagged.

2      Whether Skiplagged established its fair use defense to American's copyright infringement claims.

3.      Whether American offered any evidence of copyright infringement damages when the Copyright Act limited American to three years of damages, and American only offered a damages model about an undifferentiated lump sum for a four-year period and never connected those damages to copyright infringement.

4.      Whether American offered any evidence of causation or attribution to connect its claimed lost profits to the only alleged act of copyright infringement by Skiplagged—the allegedly improper display of American's flight logo on the Skiplagged website.

## Statement of the Case

## I. Substantive background

Skiplagged does not buy, sell, or resell airline tickets.[1] It publishes truthful information about airline pricing.[2]

American does not want the public to be fully informed about its opaque pricing schemes. This case has very little to do with legitimate enforcement of contracts or protection of intellectual property, and everything to do with American's desire to take advantage of customers who fly through an American hub airport.

Skiplagged's founder, a young entrepreneur named Aktarer Zaman, noticed a quirk in airline pricing when planning to fly to a new job in Seattle with Amazon. Some itineraries with layovers—often called "hidden-city" tickets—were priced lower than nonstop flights to the layover city itself.[3] For example, American will often charge a passenger more to fly directly from Dallas to Chicago than to fly from Dallas, through Chicago, to Des Moines.

Hidden-city ticketing is not something that Skiplagged created. It is an artifact of the "hub and spoke" network designs used by large airlines.[4]

---

[1] ROA.9333, ROA.8975, ROA.9050; s*ee also* ROA.9068-69, ROA.9051, ROA.9055, ROA.9153-54, ROA.9334, ROA.9458.
[2] ROA.8974; *see also* ROA.9056, ROA.9321.
[3] ROA.9418-21.
[4] ROA.9421-24; *see also* ROA.9429.

For decades, knowledgeable travelers have saved money on ticket prices by not flying the last leg of their itinerary.[5] What Skiplagged did was make it easier for the flying public to access that knowledge, creating a website that disclosed these fare anomalies so consumers could see the full range of options—including hidden-city options—created by airline price structures.

Skiplagged began in 2013 as a free search tool, displaying publicly available fare and itinerary information.[6] It 2017, it added a "Book Now" feature that would connect a customer directly to an airline's website.[7] The customer then decided whether to buy a ticket directly from the airline.[8] If the customer did so, Skiplagged collected a service fee from the customer of up to $35 per ticket."[9] Skiplagged never held or processed customers' money to buy tickets.[10] Nothing stopped visitors to the Skiplagged website from exiting at this point and buying hidden-city fares directly from the airlines themselves, and many did.[11]

For years, American knew all about Skiplagged. Evidence shows extensive internal discussions at American, starting as early as 2017. A team

---

[5] ROA.9420-21, ROA.9430-31.
[6] ROA.9423, ROA.9056-57.
[7] ROA.9278.
[8] ROA.9333-34.
[9] ROA.9334, ROA.9340, ROA.8956.
[10] ROA.9062, ROA.9457.
[11] ROA.9056, ROA.9323.

focused on hidden-city ticketing discussed Skiplagged (and other companies offering competing services), how Skiplagged interfaced with American's website, how American could identify passengers using hidden-city bookings, and considering steps that American could take to detect or deter hidden-city travel at check-in.[12]

## II. Procedural history

American sued Skiplagged in 2023, making claims for breach of contract, tortious interference with contract, trademark infringement, and copyright infringement.[13] The district court denied Skiplagged's motion to dismiss for lack of personal jurisdiction.[14] On cross-motions for summary judgment, the district court: (i) granted judgment for American on liability for copyright infringement, rejecting Skiplagged's fair-use defense; (ii) denied judgment for either side on trademark infringement and related defenses; and (iii) granted judgment for Skiplagged that American's contract and tortious interference claims were time-barred.[15]

American's copyright damages and trademark claims went to trial. On the trademark claims, the jury found that Skiplagged proved nominative fair use.[16] The jury awarded actual copyright damages but reduced them by

---

[12] *See infra* at 25.
[13] ROA.40, ROA.89.
[14] ROA.1046.
[15] ROA.3821–29.
[16] ROA.8003–04

$14.3 million, to $4.7 million, based on mitigation, and awarded profit disgorgement of $4.7 million.[17] The district court denied the parties' post-verdict motions and rendered judgment for American on its copyright infringement claim.[18]

## Summary of the Argument

Skiplagged's arguments as appellee are as follows:

*1. Contract claims.* American's claims for breach of the "Use Agreement" for its website are barred by limitations. American knew of Skiplagged's allegedly improper use of the website outside of the limitations period. Additionally, American failed to prove that the parties mutually assented to an enforceable agreement.

*2. Tortious interference.* American's tortious interference claims about its "Conditions of Carriage" are time-barred because they involve the same conduct as its contract claims. Additionally, American cannot prove interference with "an existing contract," because its allegations all involve Skiplagged providing information to customers before any ticket sale that could implicate the Conditions of Carriage.

*3. Nominative fair use.* The jury's verdict for Skiplagged on nominative fair use has a solid foundation in the evidence and applicable

---

[17] ROA.7984–85.
[18] ROA.8544–50, ROA.8631.

law. The jury could reasonably conclude that Skiplagged used American's marks only as necessary to identify American-operated flights, limited its use to that identification, and did not suggest American's sponsorship or endorsement.

4. *Mitigation.* The district court also correctly reduced copyright damages based on the jury's mitigation finding. American's position—that the Copyright Act allows windfalls for plaintiffs who knowingly sleep on their rights—has no support in the cited cases.

Skiplagged's argument as cross-appellant are as follows:

1. *Personal jurisdiction.* Skiplagged's globally-accessible website does not target Texas. All Texas contacts alleged by American arise from American's own, unilateral activity, and cannot support personal jurisdiction under the Supreme Court's *Walden* opinion and this Court's precedent applying it to online commerce.

2. *Fair use.* Skiplagged's use of the American flight logo to identify American flights is fair use under the statutory factors, particularly given the transformative, informational function of the use and the lack of any evidence of harm to the value of American's copyright (as opposed to allegedly lost sales of overpriced tickets).

3. *Damages.* American failed to prove copyright damages. Its expert did not even say "copyright" in his testimony.  Its expert testified to a lump sum for a four-year period, despite the Copyright Act's three-year

limitation. American also introduced no evidence of causation to tie any alleged damage to Skiplagged's use of American's flight logo.

## Argument as Appellee

**I.     The district court correctly dismissed American's contract and tortious interference claims.**

American sued for breach of its terms of use for the AA.com website (the "Use Agreement"). The district court correctly held that limitations bars this claim. American knew about Skiplagged's alleged misuse of that website outside the four-year limitations period. Judgment for Skiplagged on this claim was also proper because, as a matter of law, American's overly broad "browsewrap" terms of use, buried three pages deep in AA.com, create no enforceable legal obligation.

American's tortious interference claim about its "Conditions of Carriage" also fails as a matter of law. Because the alleged acts of interference involve alleged misuse of the American website, they are time-barred for the same reasons as the contract claim. American also cannot show any interference with an "existing contract," as that tort requires. Necessarily, when Skiplagged provided truthful information to potential customers about potential tickets, that activity occurred before any ticket sale by American that could implicate the Conditions of Carriage.

### A. American's claims about "Use Agreements" between Skiplagged and American are time-barred.

American's claims for breach of contract are subject to a four-year statute of limitations.[19] This Court applied that limitation period in its 2024 opinion of *Sheet Pile, LLC v. Plymouth Tube Co.*, holding that a contract claim accrues under Texas law "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."[20] Therefore, "a cause of action for breach of contract accrues at the moment the contract is breached."[21] The discovery rule rarely applies to claims for breach of contract because sophisticated parties are presumed to monitor their own business affairs.[22]

American argues that its website's "Use Agreement" creates obligations for Skiplagged that American can enforce with a claim for breach of contract. Specifically, American contends that "Skiplagged accepted the use Agreement anew" whenever it "accessed AA.com for a distinct flight to a distinct destination for a distinct customer."[23] Therefore, argues American, it has many contracts with Skiplagged, each with its own limitations clock.

---

[19] Tex. Civ. Prac. & Rem. Code § 16.004(a)(3).
[20] 98 F.4th 161, 166 (5th Cir. 2024) (citation omitted); *see also Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 707-08 (Tex. 2021) (same).
[21] *Sheet Pile*, 98 F.4th at 166.
[22] *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314-315 (Tex. 2006).
[23] American's Opening Brief ["AOB"] at 31.

Assuming arguendo that American's "browsewrap" terms created any legal obligations (*see infra* part I.B.), American does not accurately describe how limitations applies to its claim. The Use Agreement says that it bound Skiplagged upon its first access to AA.com. Taking that language at face value, each later instance of accessing AA.com was subject to that original agreement and did not create more than a million, identical, new agreements with Skiplagged. As in *Sheet Pile*, limitations ran when American first knew of Skiplagged's potential breach of the Use Agreement.

This description of American's contract claim is supported factually, by what the Use Agreement actually says, and legally, by well-established Texas law about contract formation.

Factually (if the visitor to AA.com can find it), the Use Agreement says that acceptance of its terms is a condition for website access:

> In return for gaining access to the Site and using it, you agree to be bound by the following Agreement without limitation or qualification, so please carefully review this Agreement before proceeding. If you do not intend to be legally bound by these terms and conditions, do not access and use the Site.[24]

From there, the terms assert that, once accepted, a user is bound by them into the future: "Any such revisions are prospectively binding on you

---

[24] ROA.2934 (emphasis added).

and therefore you should periodically visit this page when you use the Site to review the then current Agreement that binds you."[25]

Legally, Texas law requires an exchange of consideration to create an enforceable contract or contract modification.[26] Consideration is not supplied by "merely offering the pre-existing duty … already contracted to perform."[27] American has no doubt sold many tickets since 2016, but the terms of those ticket sales have nothing to do with the source of Skiplagged's alleged obligations under the "Use Agreement." If Skiplagged already committed to the terms of the Use Agreement years ago, then as a matter of law, Skiplagged could not have created millions of new contracts with the identical terms. The ship had sailed.

Characterized correctly, American's contract claim is barred by limitations. American does not contend that the relevant part of the Use Agreement has changed materially.[28] Skiplagged started business in 2013 and added the ability to book flights through American's website in 2017.[29] Evidence of American's knowledge about Skiplagged included:

---

[25] ROA.2934.

[26] *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991).

[27] *McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 93 (5th Cir. 1995); *see also id.* ("]M]erely offering the preexisting duty he had already contracted to perform cannot serve as consideration for the change.").

[28] *See* AOB at 6-7.

[29] ROA.13631; *see also* ROA.9207 (trial testimony).

- in June 2017, American internal emails discussed how it had been "dealing with" Skiplagged's open admission of facilitating hidden-city ticketing for over a year;[30]

- in May 2017, American asked a third party to restrict access to content "given [American's] discovery re. Skiplagged";[31]

- in March 2018, American stated Skiplagged was an "issue" it had been investigating;[32]

- from March to October 2018, American corresponded by email, titled "Skiplagged," discussing Skiplagged extensively;[33]

- in May 2018, American said it had been "aware of Skiplagged for over two years and have tried many different avenues to remove [American] content from their site";[34] and

- from at least November 2018 through June 2019, American prevented customers from boarding flights with tickets facilitated by Skiplagged.[35]

Yet, American did not file this lawsuit until 2023.[36]

---

[30] ROA.13667; *see also* ROA.9180-95 (trial testimony re: these exhibits).
[31] ROA.13671.
[32] ROA.13679-85.
[33] ROA.13675-66.
[34] ROA.13687; ROA.13779-80.
[35] ROA.13693-712.
[36] ROA.40, ROA.89.

This Court found a materially similar claim barred by limitations in *Sheet Pile*. The plaintiff in that case knew of "red flags," outside the four-year limitations period for a contract claim, about the defendant making sales to a third party in breach of an exclusivity agreement. [37] This Court rejected the argument that limitations restarts with each later violation of the same exclusivity term that inflicted the same injury.[38] Limitations began to run from the first breach because Texas law does not let "serial accrual" rescue time-barred contract claims based on repeated similar conduct.[39]

Here, American knew as much about Skiplagged as the plaintiff knew about the defendant n *Sheet Pile*. And the alleged breaches and injury are materially identical to those in *Sheet Pile*; there, an obligation to avoid third-party sales and damages arising from such sales, and here, a claimed obligation to avoid alleged misuse of the website with an eye towards hidden-city ticket sales. Limitations bars American's contract claim.

The two Texas Supreme Court cases cited by American are unhelpful. American cites *Barker v. Eckman*, which stated that limitations runs separately for each in a series of breaches—in the context of affirming the court of appeals' conclusion that almost all claimed breaches were

---

[37] 98 F.4th at 168.

[38] *Id.* at 168-69..

[39] *Id.*; *see also Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593, 603 (5th Cir. 2017) (resolving limitations dispute by holding: "We agree with Wells Fargo: a breach of the … term occurs at the point the lender fails to comply with the term, not later when the lender fails to cure.").

barred by limitations because the plaintiff knew about them outside the limitations period.[40] If any part of *Barker* is relevant here, it is that holding, not its summary of background principles. And in *Eagle Oil & Gas v. TRO-X*, the supreme court reversed the cited holding from the court of appeals, concluding that limitations does not start to run if a party has equitable title to a property interest. That holding is also irrelevant.

As for other cases cited by American, the only one about website terms is *DHI Group, Inc. v. Kent*, a nonprecedential opinion from this Court in 2021, which held that a signed agreement about a website's terms established the plaintiff's "reasonable measures to protect" an alleged trade secret.[41] That unexceptional holding does not examine the limitations consequences of a use agreement like American's, much less in a similar factual setting. The balance of the cases that American cites involve parties who entered a series of successive and independent contracts,[42] or a single contract with "installment" obligations over time[43]—neither of which is analogous to this case, for the reasons explained in *Sheet Pile*.

---

[40] 213 S.W.3d 306, 311-12 (Tex. 2006) (affirming in part and reversing in part *Barker v. Eckman*, 213 S.W.3d 360 (Tex. App.—Houston [1st Dist.] 2004)).

[41] No. 21-20274, 2022 WL 3755782, at *4 (5th Cir. Aug. 20, 2022).

[42] *See, e.g., Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894 (9th Cir. 2006) (noting that separate and independent contracts trigger separate limitations accruals).

[43] *See, e.g.*, *Wavetronix LLC v. Iteris, Inc.*, No. 6:21-CV-00899-ADA-DTG, 2022 WL 4211306 (W.D. Tex. Sept. 13, 2022).

American also cites this Court's unpublished opinion *in John G. Mahler Co. v. Klein Karoo Landboukooperasie DPK*, which identified a fact issue about whether the parties did, in fact, periodically negotiate a new contract between themselves.[44] No such dispute exists here.

Ultimately, American's arguments here are really reasons why it disagrees with *Sheet Pile*. But that case controls under this Court's "rule of orderliness,"[45] regardless of American's dissatisfaction.

\* \* \*

Limitations bars American's contract claim. American knew about Skiplagged's alleged breach of the Use Agreement by 2017 and did not file suit until 2023. That claim is time-barred under *Sheet Pile*.

### B. Alternatively, American's "Use Agreement" is unenforceable.

While the district court dismissed American's contract claims based on limitations, this Court may affirm on any ground presented by the record[46]—especially when that ground arises from the terms of the same "Use Agreement" that American sues to enforce.

---

[44] *John G. Mahler Co. v. Klein Karoo Landboukooperasie DPK*, 1995 WL 371037, at \*5-6 (5th Cir. June 5, 1995).

[45] *See, e.g.*, *Barrientos-Romero v. Bondi*, No. 25-60285, 2025 WL 3772151, \*1 (5th Cir. Dec. 31, 2025).

[46] C*ooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 876 F.3d 119, 126 (5th Cir. 2017) (quoting *Castellano v. Fragozo*, 352 F.3d 939, 960 (5th Cir. 2003) (en banc)); *see* ROA.15494-98 (briefing assent below).

To create an enforceable contract, Texas law requires: (1) an offer, (2) an acceptance, (3) mutual assent, (4) execution and delivery of the contract with the intent that it be mutual and binding, and (5) consideration supporting the contract.[47] No mutual assent occurred to the obligations that American is suing about for two reasons. First, under the terms of that claimed agreement, American never actually committed to do anything. Second, American did not establish that Skiplagged assented to American's deeply buried, "browsewrap" terms of use.

*1. No American obligation.* Texas law requires that an enforceable contract have mutuality of obligation.[48] "Mutuality of obligation" means "a bargained for exchange of promises."[49] An illusory promise, by a promisor who retains the option to stop performance, does not create a contract.[50]

The claimed Use Agreement does not bind American to anything. American "reserves the right to change this Agreement and to make changes to any of the products or programs described in the Site at any time without notice or liability."[51] Moreover, regardless of what the terms may

---

[47] *E.g.*, *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018).

[48] *Maharishi School of Vedic Science v. Olympus Real Estate*, No. 05-01-00140-CV, 2002 WL 1263894, at *1 (Tex. App.—Dallas June 7, 2002, pet. denied) (citations omitted).

[49] *Texas Soccer Foundation v. Sting Soccer Foundation*, No. 05-19-01228-CV, 2021 WL 4451439, at *7 (Tex. App.—Dallas Sept. 29, 2021, pet. denied).

[50] *Maharishi*, 2002 WL 1263894, at *1 (citing *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644-45 (Tex. 1994)); *see also In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (per curiam); *Alpha Partners, Ltd. v. Safeway Ins. Co.*, No. 05-01-00313-CV, 2002 WL 14297, at *1 (Tex. App.—Dallas Jan. 7, 2002, pet. denied).

[51] ROA.2934.

say, American "also reserves the right in its sole and unfettered discretion to deny you access to the Site at any time."[52]

No contract was formed by "acceptance" of these terms. In *Maharishi School of Vedic Science v. Olympus Real Estate*, a Texas appellate court held that a party's "sole and absolute discretion" to close a real-estate deal made a claimed contract unenforceable,[53] and several supreme court cases hold the same about arbitration clauses that an employer can unilaterally modify.[54] The "Use Agreement" is not an agreement.

*2. Browsewrap.* This Court holds that "[t]he chief consideration when determining the validity of contractual terms— in contracts with or without a nexus to the internet—is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to them."[55] Under Texas law, the enforceability of browsewrap agreements "generally  turns on whether the user of the website had 'actual or constructive knowledge of a site's terms and conditions prior to using the site.'"[56]

---

[52] ROA.2934.

[53] 2002 WL 1263894, at *1.

[54] *See supra* note 50.

[55] *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011).

[56] *Jones v. Homeaglow Inc.*, No. 3:25-CV-00249-S, 2025 WL 2816792, at *4 (N.D. Tex. Oct. 1, 2025) (quoting *StubHub, Inc. v. Ball*, 676 S.W.3d 193, 201 (Tex. App.—Houston [14th Dist.] 2023, no pet.)); *see also U.S. Money Rsrv., Inc. v. Kagan*, No. A-18-CV-577-LY, 2019 WL 1313469, at *4 (W.D. Tex. Jan. 29, 2019) ("[B]rowsewrap agreements …

The burden to prove a user's knowledge of a website's terms of use rests the party alleging assent to those terms—here, American.[57] American has no evidence of actual knowledge.[58] Constructive knowledge is evaluated by an objective standard that considers the conspicuousness of the website's browsewrap terms.[59]

The material facts about constructive notice were fully developed in the summary-judgment record, which shows a classic "browsewrap" situation. American required a user to click through a "Legal, privacy and copyright" link at the bottom of every page, and then click through a "policies about site usage" link to—finally—reach the text that American contends is the binding terms of use.[60] No evidence shows (indeed,

---

are typically unenforceable if the website fails to provide adequate notice of the terms and there is no showing of actual or constructive knowledge of the terms." (citation omitted)).

[57] *See StubHub,* 676 S.W.3d at 203 ("StubHub failed to meet its initial burden to show that Ball assented to the User Agreement in 2012."); *see also Kagan v. Nexo Cap. Inc.*, No. 4:24-CV-466, 2025 WL 2446301, at *15 (E.D. Tex. Aug. 25, 2025); *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019).

[58] *See* ROA.12019-20; *see also* ROA.16045, ROA.16152 (Zaman testimony re: same).

[59] *See StubHub*, 676 S.W.3d at 201 ("[The] enforceability [of browsewrap agreements] generally turns on whether notice of the terms and conditions was reasonably conspicuous." (citing *HomeAdvisor, Inc. v. Waddell*, No. 05-19-00669-CV, 2020 WL 2988565, at *3 (Tex. App.—Dallas June 4, 2020, no pet.)); *Benson v. Double Down Interactive, LLC*, 798 F.App'x 117, 118 (9th Cir. 2020) ("Constructive notice … depends on 'the conspicuousness and placement of the terms and conditions, as well as the content and overall design' of the website or mobile application.").

[60] ROA.12019-20 (and sources cited therein).

American did not even argue) that those terms are conspicuous, obvious, or even particularly noteworthy.[61]

In particular, the record does not contain American's AA.com home page or where the "Legal, privacy and copyright" link might be found—and thus lacks any evidence whether the "Legal privacy and copyright" link would be obvious to a reasonably prudent visitor to AA.com.[62] Likewise, the record does not contain the intermediate web page, where a user would land after clicking on the "Legal, privacy and copyright" link, on which the "policies about site usage" might be found.

American tried to meet its burden with multipage exhibits of the conditions of carriage and the Addendum to Governing Travel Agency Agreements, which have the "Legal, privacy and copyright" link embedded in their footers.[63] But those exhibits assume away the relevant issue, which is how a website visitor would find them in the first place.

The fact that the Use Agreement might be found somewhere, buried in its website, does not meet American's burden to show objective

---

[61] ROA.12019-20.

[62] *See Benson*, 798 F.App'x at 118 ("In the absence of actual notice, a browsewrap agreement like the Terms of Use at issue here, is enforceable only if a reasonably prudent user would have constructive notice of those terms." (citing *Wilson*, 944 F.3d at 1220)).

[63] ROA.12019-20.

conspicuousness of AA.com's purported browsewrap terms of use.[64]  Nor is it relevant that Skiplagged has terms of use for its own website, both because the standard is objective ("reasonable notice"), and because American did not establish enough facts about its own website to make any comparison meaningful.

American has also cited *Southwest Airlines Co. v. BoardFirst, LLC*, which is distinguishable because that defendant "received from Southwest the … cease-and-desist letter in which Southwest informed Bell that the Terms forbid the use of the Southwest website for commercial purposes."[65] Here, American sent no such letter before it sued.  Similarly, American made several arguments about how Skiplagged accessed the site, none of which bear on the relevant issue of what a reasonable visitor would have seen upon accessing the site.

The alleged breach of the one-sided, "browsewrap" Use Agreement is not actionable.

---

[64] *See Hunt v. CheapCaribbean.com, Inc.*, No. 3:09-CV-0622-K, 2009 WL 10704881, at *4 (N.D. Tex. June 23, 2009) ("A hyperlink mixed in with thirty-two similar links at the bottom of a webpage is not 'reasonably conspicuous notice' …"); *Fagan v. Nexo Capital, Inc.*, No. 4:24-cv-466, 2025 WL 2446301, at *15–16 (E.D. Tex. Aug. 25, 2025) ("Nexo's terms and conditions are buried at the bottom of its website amongst thirty-five similar links[.]"); *U.S. Money*, 2019 WL 1313469, at *4; *Wilson*, 944 F.3d at 1220–21 (9th Cir. 2019).
[65] No. 3:06-CV-0891-B, 2007 WL 4823761, at *7 (N.D. Tex. Sept. 12, 2007).

### C. American's tortious interference claim is time-barred and fatally defective.

The district court correctly held that American's tortious interference claim is time-barred for the same reasons as its contract claim.

American's opening brief argues that a customer's purchase of a hidden-city ticket violates the Conditions of Carriage,[66] and "also violates the Use Agreement when the hidden-city itinerary is booked through AA.com."[67] Under American's theory of the case, Skiplagged's alleged inducement to breach the Conditions of Carriage is inseparable from the website activity that allegedly violates the Use Agreement. Accordingly, American's contract and tortious interference claims accrued at the same time—well outside the two-year statute for a tortious interference claim.[68]

The Texas Supreme Court reviewed a similar situation in *Regency Field Services, LLC v. Swift Energy Operating*, examining several causes of action about mismanagement of an oil well near the plaintiff's property. The court noted that "[t]heoretically, at least, Swift could sustain each of these legal injuries to its interests in each of its nine leases at different times."[69] But, because Texas follows the "single-action rule," the plaintiff had "to bring all of its claims against Regency in one action, and limitations

---

[66] AOB at 12-13.

[67] *Id.* at 13 n.7; *see also id.* at 6, 39.

[68] *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 787, 787 (Tex. 1986).

[69] *Regency Field Services, LLC v. Swift Energy Operating*, 622 S.W.3d 807, 817 (Tex. 2021).

accrued as to all of the claims arising from legal injuries to all of the leases when the first of those legal injuries occurred."[70]

*Regency* recognized that "a defendant's wrongful conduct may breach multiple legal duties, produce multiple legal injuries, or cause multiple types of damages, and thus give rise to multiple causes of action." Nevertheless, under the single-action rule, "those claims all accrue when the first such injury occurs."[71] Other opinions have applied these principles to bar tortious-interference claims linked to other alleged wrongdoing.[72] American's tortious interference claims are similarly time-barred.

Skiplagged also argued that American's tortious interference claims failed because American could not prove the first element of that tort: "the existence of a contract subject to interference."[73]

As just shown, American alleged interference with its "Conditions of Carriage" by encouraging customers to buy tickets while planning to disembark early from a scheduled flight. By their terms, though, the Conditions of Carriage apply only "[w]hen you buy a ticket or travel on a

---

[70] *Id.*

[71] *Id.* at 814-15.

[72] *See John v. City of San Antonio*, Civil No. SA–07–CA–380–FB, 2007 WL 9706474, at *17 (W.D. Tex. July 24, 2007) (tortious interference claim and related slander claims both time-barred); *Roehrs v. Conesys, Inc.,* No. Civ.A. 3:05–CV–829–M, 2005 WL 3454015, at *4 (N.D. Tex. Dec. 14, 2005) ("[T]he cause of action accrues when Defendants first interfered with the contract and caused harm to the plaintiff, not when Defendants' interference ends.").

[73] *See Tex. Beef Cattle Co. v. Green*, 21 S.W.2d 203, 210 (Tex. 1996).

flight provided by American Airlines …."[74] No customer bought a ticket from American until *after* Skiplagged's allegedly wrongful interactions with the customer,[75] and no customer could "travel on" an American flight— much less, decide to disembark early from it—until after that ticket sale.

As a result, Skiplagged could not possibly interfere with "a contract in existence" at the time of Skiplagged's actions. Illustrating that point, Skiplagged's "encouragement" actually *facilitated* ticket sales by American from which American made over $200 million in revenue.[76] In other words, contracts came *into existence* as a result of Skiplagged's activity, showing that those contracts were not "in existence" before.

The most recent Texas Supreme Court case about tortious interference favors Skiplagged's position. In its 2025 opinion of *Inwood Nat'l Bank v. Fain*, the plaintiff claimed that the defendant interfered with a contract right to receive a transfer of stock in a bank. The supreme court reviewed that contract and held that as a matter of law, it conferred no such right on plaintiff because a condition precedent had not been satisfied.[77] It concluded: "[Plaintiff]'s failure to demonstrate a 'specific contract right' to the … shares means that his tortious interference claim must fail."[78]

---

[74] ROA.2908.
[75] *See supra* at 16, *infra* at 43-45.
[76] ROA.9547.
[77] 706 S.W.3d 342, 351 (Tex. 2025).
[78] *Id.* (quoting *Hurlbut v. Gulf Atl. Life Ins. C*o., 749 S.W.2d 762, 767 (Tex. 1987) (cleaned up)).

Similarly, American had no rights under the Conditions of Carriage absent "carriage"—a ticket sale.

Other Texas opinions reach similar holdings, as to an insurance agent's claim that an insurer wrongfully interfered with future commission sales to potential customers,[79] a real-estate contract that did not yet exist when the defendant allegedly interfered with it by filing a frivolous lawsuit,[80] and a city ordinance that did not have the claimed effect of awarding a waste-disposal contract at the time an allegedly defamatory memorandum was circulated.[81] To the extent that American's tortious-interference claim is not time-barred, it is not actionable.

## II. The district court correctly rendered judgment against American on its trademark claim based on the jury's finding of nominative fair use.

Skiplagged never bought or resold a single American ticket involving any fare, hidden-city or otherwise. Instead, Skiplagged directed potential customers to the American website, after providing them with truthful information about American's unfair and opaque pricing practices—and truthfully using American's flight symbol to identify flights that were, in fact, operated by American. That is a textbook example of nominative fair

---

[79] *Hurlbut*, 749 S.W.3d at 767.

[80] *Dominguez v. Dominguez*, 583 S.W.3d 365, 372-73 (Tex. App.—El Paso 2019, pet. denied).

[81] *Tex. Disposal Landfill, Inc. v. Waste Mgmnt. Holdings, In*c., 219 S.W.3d 563, 589-90 (Tex. App.—Austin 2007, pet. denied).

use. Because the jury's verdict on that subject was supported by ample evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions,"[82] this Court should affirm the district court's rendition of judgment for Skiplagged on American's trademark claim.

### A. Skiplagged could assert nominative fair use.

The doctrine of nominative fair use allows a business to use another company's trademark to advertise goods, so long as the use does not imply "affiliation with, sponsorship by, or endorsement by" the trademark holder.[83] Proof of nominative use requires showing that (1) use of the mark was necessary to identify the plaintiff's product or service, (2) no more of the mark was used than reasonably necessary, and (3) the use did nothing to suggest sponsorship or endorsement.[84] The jury plays a vital role in resolving fact disputes about such issues.[85] American argues that Skiplagged cannot rely upon nominative fair use doctrine because Skiplagged is not an authorized seller for American.[86] This Court

---

[82] *Brown v. Bryan County*, 219 F.3d 450, 456-57 (5th Cir. 2000).

[83] *Fetzer*, 381 F.3d at 488.

[84] *Bd. of Suprvs. for LSU v. Smack Apparel Smack Apparel Company*, 550 F.3d 465, 489 (5th Cir. 2008).

[85] *See generally Streamline Prod. Systems, Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 452 (5th Cir. 2017) ("[T]his question of the categorization of the mark was 'best weighed by a jury after a full presentment of the evidence.'" (citation omitted)).

[86] AOB at 42 n.22, 43-47.

recognizes no such restriction; to the contrary, its precedent makes this doctrine available—without limitation—to "*one* who has lawfully copied another's product."[87] Application of the nominative fair use doctrine turns on how a mark is used, not who may have used it.

Lacking any case that actually limits nominative fair use to certain commercial settings, American attempts to tease one out from factual details in a series of cases. None support American's argument; indeed, none discuss nominative fair use. This Court's *Fetzer* opinion held that a plaintiff failed to prove confusion as a matter of law.[88] *Volkswagenwerk AG v. Church*, an almost sixty-year old Ninth Circuit case, held that "[e]ach case of this type must be decided on its own facts," and then concluded that a repairman had successfully distinguished his shop from a Volkswagen dealership.[89] And *Trail Chevrolet, Inc. v. Gen. Motors Corp.*—an even older car-dealership case—affirmed an injunction with the proviso that the defendant is "entitled to offer Chevrolet cars for sale by the name so long as the registered mark or tradename of Chevrolet is not used in a manner to deceive purchasers." [90] None of these cases addresses facts comparable to

---

[87] *Smack Apparel*, 550 F.3d at 488 (emphasis added); *Pebble Beach*, 155 F.3d at 545 (same); *see also Survitec Survival Products, Inc. v. Fire Prot. Serv., Inc.*, No. CV H-21-312, 2025 WL 2782332, at *11 (S.D. Tex. Sept. 30, 2025) (stating that this doctrine is available to "a business").

[88] *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484-87 (5th Cir. 2004).

[89] *Volkswagenwerk AG v. Church*, 411 F.2d 350, 352 (9th Cir. 1969).

[90] 381 F.2d 353, 354 (5th Cir. 1967),

the facts about how Skiplagged used American's marks, and Skiplagged's informational role in the customer's eventual purchase.

Next, American argues that, based on its expert's analysis of the "digits of confusion," consumers were actually confused as to Skiplagged's relationship with American, so that Skiplagged cannot rely on the defense of nominative fair use.[91]

This argument could have force in a case about confusion between *two different* trademarks. But not here, where Skiplagged used American's trademark to identify American's products.[92] Because nominative use *necessarily* involves use of the plaintiff's mark to identify the plaintiff's product, several traditional "digits of confusion" will often appear to favor confusion even where none exists.[93] The Southern District of Texas aptly summarized this issue in *BDO Seidman LLP v. Alliantgroup, L.P.*:

> Furthermore, BDO's argument ignores the whole *raison d'etre* of fair use, which is to protect the justifiable use of trademarks. If the free use of fair marketing language was prevented just because a competitor could locate some recipients of that marketing who misunderstood its meaning, the application of trademark law would become detached from its moorings.[94]

---

[91] AOB at 53-54.

[92] *See BDO Seidman*, 2009 WL 1322555, at *9.

[93] *See Fetzer*, 381 F.3d at 485–86.

[94] No. CIV.A.H-08-905, 2009 WL 1322555, at *9 (S.D. Tex. May 11, 2009) (citations omitted).

That is why this Court has cautioned: "Fair use is protected even if confusion is likely."[95] Confusion is only one factor in the broader likelihood-of-confusion inquiry, not a dispositive factor,[96] and certainly not where it would upset the entire doctrine at issue.

American also treats its survey and anecdotal complaints—evidence it offered to establish confusion—as dispositive.[97] But the jury heard and weighed competing evidence, including criticisms of American's "survey,"[98] the significance of consumer complaints (and their relative scope),[99] and whether nominative use caused any purported confusion versus other dynamics.[100] The jury was fully entitled to accept Skiplagged's criticisms over what American offered.

In sum, this Court's precedent does not restrict nominative fair use to any single commercial category, such as authorized resellers or repair shops. The inquiry turns on whether the defendant's use of the mark, viewed in its full context, identifies the trademark holder's goods and services or improperly suggests endorsement or affiliation. The jury and district court faithfully applied that precedent here.

---

[95] *Fetzer*, 381 F.3d at 484, n.2.

[96] *Fetzer*, 381 F.3d at 486–89; *Smack Apparel*, 550 F.3d at 477 n.35.

[97] AOB at 53.

[98] ROA.9641-47, ROA.9125, ROA.9129-30130, 9656.

[99] ROA.9644-47, ROA.9067, ROA.9134 (one expert calling the number of complaints "infinitesimal," and the other calling it "the tip of the iceberg").

[100] ROA.9124, ROA.9136, ROA.9312, ROA.9454.  ROA.9648, 9657; *see also* ROA.9113.

**B. Skiplagged presented sufficient evidence that its use of American's mark was necessary and appropriately limited.**

American next argues that Skiplagged "offered no evidence" that use of American's mark was necessary or limited because "no witness testified" in those terms.[101] American is incorrect. Ample evidence showed that Skiplagged used the American mark only as reasonably necessary to identify American flights, using no more of the mark than necessary.[102]

Start with Skiplagged's homepage, which displayed only Skiplagged's own brand and messaging. No airline marks appeared, or could appear, until a customer ran a search by entering origin, destination, dates, and passengers:[103]



---

[101] AOB at 47.

[102] *See Smack Apparel*, 550 F.3d at 489; *Fetzer*, 381 F.3d at 485–86.; *see also* AOB at 42.

[103] ROA.9317–9319, 9322–9323, 10284.

Then, airline logos only appear after the search results are shown.[104] In every case, a logo identifies the operating carrier for each itinerary, for both American and its direct competitors for that trip:[105]



From there, the website continues to provide accurate information, that is obviously not coming from an airline. When the consumer chooses a hidden-city itinerary, Skiplagged displays its details, including its hidden-city status in red. The leg to be "skipped" is grayed out and crossed through. In



this example, the customer's choice identified two outbound options, one of which is hidden-city.

---

[104] ROA.10286–93; ROA.9324-25.
[105] ROA.10286–93; ROA.9324-25.

If the consumer selects the hidden-city ticket option, Skiplagged presents a second popup with a series of warnings. They tell the customer that they are not looking at an American website.  The popup starts with the warning that "This is a hidden-city ticket!"[106] and then walks the customer through three more warnings

The first,  labeled "Backpack only," advises that "[w]e recommend only bringing a backpack that can fit under the seat in front of you," because any checked bag "will end up in Hartford."[107] The consumer cannot proceed with booking unless he affirmatively checks a box acknowledging, "I understand that I cannot check my bag(s)."[108]



Once the customer checks that box, Skiplagged presents the second warning, "Bad weather," which states, "In rare times of irregular operations such as bad weather, your itinerary may change at the discretion

[106] ROA.9130, ROA.10295.
[107] ROA.9639-37, ROA.10295.
[108] ROA.9635-36, ROA.10295.

of the airline. If that happens, ask to be changed to a similar itinerary."[109] Again, the customer must affirmatively check the box to proceed.[110]

Skiplagged then gives a third warning: "Angry airlines," which continues: "Airlines don't like when you miss flights to save money so don't do this often."[111] Again, to proceed, the customer must affirmatively check a box acknowledging this warning.[112]

If the customer has previously bought a hidden-city ticket, he receives yet another popup warning: "It looks like you booked hidden-city with American Airlines in the past so there is a small chance that this

booking will be flagged. If asked by airline staff, say that you are heading to Hartford (NOT Chicago) or you will be forced to pay the normal price."[113]



Skiplagged again seeks confirmation that the consumer wants to purchase a hidden-city ticket and risk American's displeasure: "Should we continue?" The customer must click "OK" to proceed.[114] If at any time, the customer rethinks his decision and wants to select a different fare, go

---

[109] ROA.10295.
[110] ROA.9637, ROA.10295.
[111] ROA.9637, ROA.10295.
[112] ROA.9637, ROA.10295.
[113] ROA.10298.
[114] ROA.10298; *see also* ROA.8955-56, ROA.9001 (testimony re: this process)

directly to American's website, visit another travel site, or not fly after all, she can just exit Skiplagged.com with no further obligation.[115]

American's investigator conceded that these warnings—not to check luggage, that bad weather may force the customer to change plans, that the customer's purchase of a hidden-city ticket makes airlines "angry"—do not appear on airline-sponsored booking sites.[116] Nobody would expect an American-sponsored site to offer bookings on other airlines. And, other than identifying the source of itineraries that fit a customer's search, Skiplagged does not display American's (or any other carriers') trademarks, further distancing itself from the airlines.

American mischaracterizes the testimony of Mr. Zaman, Skiplagged's founder, on this point. The cited excerpts about the "Flight Symbol" logo not affecting booking behavior do not compel a conclusion that carrier identification was unnecessary.[117] In that testimony, Zaman said that as a test, Skiplagged replaced the flight logo with the words "American Airlines" to identify the carrier on American itineraries. Taken as a whole, his testimony shows that the logo was not being used as a persuasive or source-signaling marketing device, and that carrier identification served a straightforward informational purpose in a multi-airline marketplace.

---

[115] ROA.9323-24, ROA.9343.
[116] ROA.8948-49, ROA.10295.
[117] AOB at 48 (citing ROA.8982, ROA.9438, ROA.9452).

Certainly, a rational jury could consider this testimony—as part of a "one of many" presentation, combined with prominent warnings, acknowledgments, and Skiplagged's own messaging—as reducing, not increasing, any perceived affiliation or sponsorship.[118]

The jury's verdict about nominative fair use was well within bounds for affirmance.

### C. *Pebble Beach* does not establish a per se "prominence" rule.

American leans heavily on this Court's *Pebble Beach* opinion to argue that "prominent" use equals affiliation as a matter of law.[119] In that case, a themed "replica" golf course marketed itself by invoking famous courses by name and styling various holes after well-known ones from those courses.[120] This Court held that the defendant's prominent use of the defendant's marks to market its own product (including advertising, food menus, and on-course material) suggested "affiliation, sponsorship, or approval."[121] *Pebble Beach* did not focus on repeated use of a trademark, much less to identify the plaintiff's own products.

---

[118] *See Smack Apparel*, 550 F.3d at 489 (focusing on whether the use suggested affiliation, sponsorship, or endorsement).

[119] AOB at 48-49.

[120] *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 534-545 (5th Cir. 1988).

[121] *Id.* at 547.

That distinction matters. Nominative fair use does not turn on whether a defendant uses the mark only once, but on whether the use is limited to what is reasonably necessary to identify the product, and whether it suggests sponsorship or affiliation.[122] *Fetzer* did not impose a one-time-use rule; instead, it held that likelihood of confusion depends on the context and presentation of the mark, including why and how the mark appears.[123]

Here, the jury reasonably found that repeated references to the operating carrier occurred precisely where a consumer would expect to see that information—search results, itinerary displays, checkout, and confirmation—because carrier identity is an inherent attribute of the flight being described, not a signal of sponsorship or endorsement. And when the process ends and a consumer elects to proceed with a hidden-city fare, Skiplagged facilitates the consumer booking with American on its website and the customer pays American directly for the ticket.

The court's analysis in *Pebble Beach* crystallizes the issue here: whether, in context, Skiplagged's presentation functioned as mere identification of American routes and pricing or instead conveyed affiliation.[124] All of the factors, in context, is what drives a consumer's

---

[122] *Smack Apparel*, 550 F.3d at 488–89; *Fetzer*, 381 F.3d at 485–86.
[123] 381 F.3d at 485–86.
[124] AOB at 48-49.

conclusions as to affiliation or lack thereof.[125] Here, the jury resolved that factual question against American.

### D. American's "first sale" argument is legally inapposite.

American next tries to recast this case as a failed invocation of the first-sale doctrine.[126] That doctrine does not apply.

The first-sale doctrine applies when a defendant resells genuine trademarked goods; for example, buying a new book at a store and then reselling it online.[127] But here, Skiplagged does not sell American's tickets *at all*, much less resell them. American and its authorized agents alone sell its tickets; American alone controls the terms of sale.[128]

Skiplagged merely identifies available flights from American (and other airlines) and facilitates ticket purchases for the customer directly from American if the customer chooses to buy an American flight.[129] The first-sale doctrine is wholly irrelevant to that situation.

And as noted above in discussing nominative fair use generally, this Court does not recognize bright-line rules about who may rely upon that

---

[125] *See Fetzer*, 381 F.3d at 485.
[126] AOB at 43-44.
[127] *See Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*, 988 F.2d 587, 590-93 (5th Cir. 1993).
[128] *Id.*
[129] *See supra* at 17, 42 *et seq*.

doctrine. That principle applies here as well, to this additional attempt by American to create such a categorical rule.

### E. The jury reasonably rejected American's "implied endorsement" theory.

American's final argument is a theory of "implied endorsement" based on the third factor about nominative fair use, which asks whether the defendant did anything to suggest sponsorship or endorsement. Again, American assumes that the only proper view of the evidence is its own.[130] But the full record shows a reasonable basis for the jury to find that Skiplagged did not hold itself out as American's agent or an authorized seller:

- Skiplagged presented American flights alongside those of dozens of other airlines, including American's direct competitors;[131] as in *Fetzer*, a rational factfinder could treat that "one of many" presentation as inconsistent with an endorsement message;[132]

- Skiplagged displayed its own branding and described its role as a search/booking facilitator rather than as the airline itself or

---

[130] AOB at 50-54.
[131] ROA.8955, 10286-93.10293.
[132] 381 F.3d at 485–86.

an authorized agent;[133] a rational jury could find that structure communicated separation, not sponsorship;

- Skiplagged showed that its website visitors wishing to purchase an American flight did so directly from American by using American's website, which displayed American's trademarks;[134] and

- the jury could reasonably weigh any disclaimers and the site's overall messaging (including "angry" airlines) as reducing, rather than increasing, any perception of affiliation.[135]

American points to "Book with Skiplagged!" language and customer-support links.[136] But a jury could reasonably interpret those as describing the user flow (Skiplagged's platform for locating itineraries and directing a consumer to the airline that will issue the ticket), not as a representation that American sponsored Skiplagged.

American attempts to contort precedent to bar Skiplagged's fair use defense altogether; however, settled law refutes these theories. And American's 10-page attack on the verdict does not allege insufficient evidence; instead, American recites the evidence, asks the Court to draw

---

[133] ROA.9317-19, 9322-23.

[134] *See supra* at 42 *et seq.*

[135] *See Smack Apparel*, 550 F.3d at 489 (focusing on whether the use "suggest[ed] affiliation, sponsorship, or endorsement").

[136] AOB at 52.

different inferences, and demands a different result.[137] In short, American reweighs the evidence and invites this Court to do the same.[138] The Court should decline the invitation and affirm the finding of nominative fair use.

### III.    The district court correctly credited the jury's finding about mitigation to reduce American's copyright damages.

American asks this Court to render judgment in its favor for $19,000,000 in damages, even though the jury found that American could have avoided $14,300,000 with reasonable effort. American's claim that mitigation has no place in copyright law (and thus, allows this sort of windfall recovery) lacks merit.

Throughout this section, American mischaracterizes Skiplagged's position as a "delay-based mitigation defense." It's not. Skiplagged argued that American failed to mitigate its claimed damages because American knowingly continued to accept and profit from the transactions at issue. Skiplagged's approach properly reduces damages when appropriate; it does not bar their recovery outright.

---

[137] AOB at 41-57.

[138] AOB at 47-57; *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (reminding that the jury makes credibility determinations and weighs evidence).

### A. The Copyright Act does not preclude mitigation as a limitation on damages.

American contends that the Copyright Act forecloses Skiplagged's mitigation defense because that defense is laches by another name.[139] American's argument has no support in the cited cases.

The Supreme Court's *Petrella* opinion holds that laches cannot *bar* damage claims that arise within the Copyright Act's three-year limitations period.[140] *Petrella* does not hold that a plaintiff's delay is irrelevant to damage calculation, or that all losses claimed within limitations are automatically recoverable. To the contrary, *Petrella* stated that a plaintiff's delay may be considered at the remedial stage: "[T]he District Court, in determining appropriate injunctive relief and *assessing profits*, may take account of [plaintiff's] delay in commencing suit."[141]

*Nealy* does not overrule *Petrella*. In *Nealy*, the Supreme Court rejected a time-based damages cap for claims that were otherwise timely filed, concluding that such a cap was inconsistent with the Copyright Act's remedial provisions.[142] The Court did not address mitigation of damages at all, and referred to the Act's remedial provisions only to reject the lower court's "judicially created" time bar.[143]

---

[139] AOB at 58.
[140] 572 U.S. 663, 677 (2014).
[141] *Id.* at 687 (emphasis added).
[142] *Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 374 (2024).
[143] *Id.* at 372.

Skiplagged's reliance on mitigation is fully consistent with *Nealy*. As used here, mitigation imposes no cap or limit on recoverable damages; rather, as encouraged by *Petrella*, it operates within 17 U.S.C. § 504 (the Copyright Act's remedial provision) to ensure that damages were actually caused by copyright infringement.[144]

The key precedent is this Court's 2024 opinion in *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, which held that that a failure to mitigate could reduce the recoverable consequential damages for copyright infringement.[145] This Cout noted that "mitigation typically applies to consequential damages" because a defendant should be "entitled to a credit against liability for any consequential damages plaintiff could have avoided or minimized by reasonable effort or expense."[146] Because "lost profits and collateral expenses are common forms of consequential damages," mitigation should be considered in calculating them.[147]

While *Energy Intelligence* also rejected the argument that the plaintiff had a duty to prevent future infringements before they occurred, concluding that such a duty conflicted Copyright Act's separate-accrual rule,[148] it further held that a failure to mitigate was not an absolute bar to

---

[144] *Petrella*, 572 U.S. at 687.
[145] *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 274–75 (5th Cir. 2020).
[146] *Id.* at 275.
[147] *Id.*
[148] *Id.* at 274.

recovery of statutory damages.[149] Those holdings are fully consistent with what the opinion said about mitigation and lost-profits claims.

American's argument that mitigation is just a relabeled laches defense is belied by the cases that it relies upon.

### B. The jury weighed the conflicting evidence and reasonably determined that American failed to mitigate its damages.

The jury was asked whether American unreasonably failed to take advantage of opportunities to mitigate its damages.[150] As authorized by *Petrella* and *Energy Intelligence*, that question addressed whether the full measure of damages sought by American was attributable to the alleged infringement or instead, to American's own decisions.

Skiplagged presented evidence that American knew of the challenged conduct for years and chose to keep accepting revenue from the transactions without objection to Skiplagged.[151] American countered with evidence describing steps that it claimed to have taken to address

---

[149] 948 F.3d at 274.
[150] ROA.7984.
[151] ROA.7741 (arguing that the defense of failure to mitigate damages "is impossible for American to overcome given it profited on every sale as to which it claims Skiplagged infringed"); ROA.9790 (arguing that American unreasonably failed to reduce its damages while accepting "hundreds of millions of dollars in revenue" generated by Skiplagged).

Skiplagged's conduct and limit harm.[152] The jury was entitled to weigh that competing evidence and resolve the matter in Skiplagged's favor.

American now asks this Court to recast that evidentiary dispute as a categorical rule of law. But *Petrella* only rejects laches as a complete bar to timely claims and does not eliminate mitigation or prevent a jury from considering whether the plaintiff's claimed damages were reasonably avoidable. Because Skiplagged advanced a valid damages-limitation theory and presented evidence supporting it, the district court correctly denied judgment as a matter of law.

## Argument as Cross-Appellant

Skiplagged presents three issues by cross-appeal. The first is personal jurisdiction. American's arguments for specific jurisdiction are directly contrary to the Supreme Court's opinion in *Walden v. Fiore* and this Court's precedent applying that case to online commerce. American is based in Texas, but Skiplagged is not, and Skiplagged has done nothing more in Texas than any other out-of-state business with a nationally accessible website.

The second issue is fair use—whether American's copyright claims should have gone to trial at all. Skiplagged used the flight logo solely, and

---

[152] ROA.9173-76.

accurately, to identify American flights. American did not claim that Skiplagged damaged the value of its copyright.

The third issue is damages. American's expert testified to a single lump-sum damages number that covered a four-year period, with no annual analysis. The Copyright Act limits damages to a three-year period. That mismatch requires reversal. Also, American offered no evidence that any lost profits of American, or profits earned by Skiplagged, were caused by Skiplagged's alleged copyright infringement. As a matter of law, the mere presence of the symbol on the website is not enough to show causation— especially when American's damages expert did not even mention the symbol or the word "copyright".

## I. American failed to establish personal jurisdiction over Skiplagged in Texas.

The denial of Skiplagged's motion to dismiss is appropriately reviewed in an appeal from final judgment.[153] This Court has not defined the scope of review for such an appeal, but the Fourth Circuit resolved one by reviewing the record before the district court when it denied the motion to dismiss.[154] Here, that record consists solely of American's pleading and

---

[153] *See al-Suyid v. Hifter*, 139 F.4th 368 (4th Cir. 2025); *Sec. & Exch. Comm'n v. Gastauer*, 93 F.4th 1 (1st Cir. 2024); *C5 Med. Werks, LLC v. CeramTec GMB*H, 937 F.3d 1319 (10th Cir. 2019); *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 903 F.3d 896 (9th Cir. 2018).
[154] *See Hifter*, 139 F.4th at 377.

Skiplagged's motion and supporting evidence,[155] because the district court ruled without a response from American.[156] When no evidentiary hearing is held, courts accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by affidavits.[157]

Nevertheless, a plaintiff must establish specific personal jurisdiction for each claim raised.[158] The record presented by Skiplagged with its motion to dismiss showed that American did not meet that burden for its copyright and trademark claims. Those claims should be dismissed for lack of personal jurisdiction, and with them, the rest of the case, because both parties are Delaware corporations,[159] and thus lack the diversity of citizenship needed for supplemental jurisdiction over American's state-law claims.[160]

Establishing personal jurisdiction for a trademark or copyright claim requires a showing of minimum contacts, consistent with the limits of due process.[161] That requires showing that the defendant purposely availed itself of the benefits and protections of the forum state.[162] "The analysis

---

[155] ROA.184, ROA.214.

[156] ROA.1046.

[157] *Latshaw v. John*ston, 167 F.3d 208, 211 (5th Cir. 1999).

[158] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

[159] ROA.7747 ¶¶ II.1-2.

[160] *See Mitchell v. Bailey*, 982 F.3d 987, 943 (5th Cir. 2020).

[161] *See Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 458 (5th Cir. 2006).

[162] *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 786 (5th Cir. 2021).

applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case."[163]

The key Supreme Court case is *Walden v. Fiore*, in which a Georgia-based DEA agent prepared a forfeiture affidavit in Georgia about people who lived in Nevada.[164] They sued him in Nevada about alleged inaccuracies in the affidavit, alleging that they were injured there and communicated with the agent from there. *Walden* rejected those allegations as a basis for jurisdiction, stating: "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[165] Contacts arising from the plaintiff's unilateral activity—such as communications involving the forum state or the transfer of funds there—do not establish forum contacts by the defendant.[166]

Under *Walden*, personal jurisdiction cannot be based in the trademark owner's home state just because the plaintiff asserts damage to its property interest in its trademark there.[167] The same is true for copyright claims.[168]

---

[163] 18 F.4th at 786.

[164] 571 U.S. 277 (2014).

[165] *Id.* at 290.

[166] *Id.* at 291.

[167] *Honus Wagner Co. v. Luminary Grp. LLC*, 2017 U.S. Dist. Ct. LEXIS 210097, at *39 (S.D. Fla. 2017); *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1209, n.5 (9th Cir. 2020); *Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520, 521 (7th Cir. 2018) (all applying *Walden* in trademark cases).

[168] *Janus v. Freeman*, 840 Fed App. 928, 930 (9th Cir. 2020); *see also Parker v. Winwood*, 938 F.3d 833, 840 (7th Cir. 2019).

After *Walden*, purposeful availment focuses on the defendant's conduct, and a plaintiff's location or unilateral acts cannot change that focus.

The record shows three sets of allegations made by American to support specific jurisdiction over Skiplagged: (1) the role of Skiplagged's website; (2) alleged "data gathering" by Skiplagged; and (3) the "browsewrap" terms about use of the AA.com website. All of those matters are ultimately settled by *Walden* and this Court's precedent applying that case to online commerce.

*1. Website.* This Court's recent *Admar* decision makes clear that merely running a website that is accessible in all fifty states—even if it allows interactivity—does not create minimum contacts so long as it does not specifically target the forum state. The defendant must take the additional step of targeting the forum state in a manner that reflects "purposeful availment" of the opportunity to do business in that state.[169] There was no evidence that Skiplagged took either step.

Skiplagged's website is not specifically directed to the Texas market, nor does it specifically target Texas consumers.[170] Skiplagged does not specifically solicit Texans to visit its website, does not advertise or market its services specifically to Texas residents, and does not specifically direct

---

[169] *Admar*, 17 F.4th at 786.
[170] ROA.219 ¶ 13.

its website to Texas.[171] Skiplagged treats Texans like everyone else.[172] If a Texan visits Skiplagged's website, that visit has no jurisdictional significance—it is simply the unilateral activity of that Texan typing Skiplagged's web address into a browser and pressing "Enter."

As this Court recently held in *Johnson v. TheHuffingtonPost.com, Inc.*: "To target every user everywhere … is to target no place at all."[173] It would be fundamentally unfair to Skiplagged, contrary to Skiplagged's reasonable expectations of its jurisdictional exposure, and violative of Skiplagged's due process rights, to allow a plaintiff to sue Skiplagged in every state on the accessibility of its website.[174]

Even if Skiplagged.com is considered "interactive" as defined by some personal-jurisdiction cases, because it exchanges a limited amount of data with unidentified visitors, that capability does not create minimum contacts. "[I[nteractivity reflects only a website's *capacity* to avail itself of a particular place."[175] Therefore, just because a "site *can* exploit a forum does not mean that it *has* or that its forum contacts produced the plaintiff's claim."[176] Interactivity alone is not enough.[177]

---

[171] *Id.*
[172] *Id.*
[173] *Johnson v. TheHuffingtonpost.com, Inc.*, 21 F.4th 314, 321–22 (5th Cir. 2021).
[174] *Id.* at 320.
[175] *Johnson*, 21 F.4th at 319 (emphasis in original) .
[176] *Id.*
[177] *Id.* at 320.

The Northern District of Illinois' opinion in *United Airlines, Inc. v. Zaman* is on point to that issue. United Airlines and Orbitz sued Skiplagged's founder, a New York resident, in Illinois. The court held that publication of Illinois-based United Airlines' information on Skiplagged.com did not create personal jurisdiction there because Skiplagged did not engage in any "geographically targeted" activity.[178] The record here is materially identical. The Skiplagged website does not create personal jurisdiction for American's intellectual property claims in Texas.

*2. Alleged "data gathering."* American alleged that Skiplagged "uses electronic mechanisms" to "interact with AA.com" and "obtain American's fare, schedule and inventory content," and then "modifies and republishes the data on Skiplagged.com."[179] And, according to American, Skiplagged allegedly "employs an automatic electronic means to monitor [and] copy the dynamic and ever-changing AA.com website content in order to have real time fare, schedule and inventory information available to customers...."[180]

American's reliance on a line of district-court cases involving defendants that intentionally hack or "data scrape" information from

---

[178] *United Airlines, Inc. v. Zaman*, 152 F.Supp. 3d 1041 (N.D. Ill. 2015).
[179] ROA.98 ¶ 37.
[180] ROA.101-02 ¶ 48.

websites known to belong to Texas plaintiffs is misplaced.[181] But the record here showed that Skiplagged did not obtain any of American's flight and fare information directly from American's website or servers,[182] nor did it obtain any of "American's Marks" from those locations.[183] Moreover, there is no evidence in this record about the location of American's servers and that cannot be the jurisdictional nexus. Wherever American may keep its data, there was no jurisdictional evidence that Skiplagged obtains American's flight and fare information from anywhere other than publicly available sources such as online travel agencies, global distribution systems, and other travel metasearch engines.[184] Thus there was no jurisdictional nexus based on the information Skiplagged published about American flights.

American also alleged that, because American's headquarters are in Texas, Skiplagged "booked" American tickets for its customers through AA.com, and thus communicated with Texas as to passenger information about any ticket facilitated by Skiplagged on AA.com.[185] Factually, Skiplagged rebutted these claims, and legally, they do not create minimum contracts.

---

[181] *See, e.g.*, *BidPrime, LLC v. SmartProcure, Inc.*, 2018 U.S. Dist. LEXIS 180546, at *5–9 (W.D. Tex. 2018) (plaintiff who engaged in "repeated intentional actions to harvest data from a Texas company" through data scraping the company's servers was subject to specific jurisdiction); *Southwest Airlines Co. v. Kiwi.com, Inc.*, No. 3:21-cv-00098-E, 2021 WL 4552146, at *3 (N.D. Tex. Aug. 10, 2021) (it hacked and data scraped flight and pricing information from servers that it knew belonged to a Texas company).
[182] ROA.218-19 ¶¶ 10, 11.
[183] ROA.219 ¶ 10.
[184] ROA.218-19 ¶ 11.
[185] ROA.90 ¶ 8, ROA.91-92 ¶¶ 11-12.

Skiplagged does not "sell" or "purchase" American tickets for consumers and instead, refers customers to online travel agents or facilitates a consumer's purchasing of a ticket with an airline; it is not an agent of American, and it has never bought or sold American tickets.[186] When Skiplagged facilitates the users' purchase of a given flight, it does so without regard to American's location at the direction of its customers who wish to reserve a given flight on AA.com.[187] Nothing about those relationships involves purposeful availment of Texas—the location of Skiplagged, the airline, the customer, and the destination could all be anywhere.[188] Under *Walden*, that activity creates no purposeful availment of Texas jurisdiction.

Moreover, Skiplagged.com's entry of a user's information into an AA.com web page on behalf of consumers occurred entirely outside of Texas.[189] The mere fact that such conduct involved American, which happens to maintain its headquarters in Texas, does not suffice to authorize Texas jurisdiction.[190] And again, American neither alleged nor introduced

---

[186] ROA.218-19 ¶¶ 10–12, ROA.220 ¶ 15; *see also supra* at 16.
[187] ROA.219-20 ¶¶ 12, 13, 15.
[188] *See Sayers Constr., L.L.C. v. Timberline Constr. Inc.*, 976 F.3d 570, 573 (5th Cir. 2020).
[189] ROA.219 ¶ 13.
[190] *See Walden*, 571 U.S. at 291; *see also Heavy Duty Prods., LLC v. Bandwdth, LLC*, 2015 U.S. Dist. LEXIS 62252, at *13 (W.D. Tex. 2015), adopted by *Heavy Duty Prods., LLC v. Band Wdth, LLC*, 2015 U.S. Dist. LEXIS 183124 (W.D. Tex. July 21, 2015); *see also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004.

any evidence about the location of its servers, making the Texas connection even more tenuous.

*3. Browsewrap.* American cited its "browsewrap" terms of use, discussed earlier, that allegedly create an "acknowledgment that the terms of the site constitute an agreement made and entered into in Tarrant County, Texas," and which purport to provide that "Texas law governs this Agreement's interpretation and/or any dispute arising from your access to, dealings with, or use of the Site."[191] Assuming arguendo that anything about that browsewrap "agreement" is enforceable, *see supra* Part I.B., its language does not create specific personal jurisdiction over Skiplagged.

To start with, the purported Texas choice of law provision in the Use Agreement has "little impact by itself."[192] Similar to the Northern District of Texas's determination that personal jurisdiction was lacking in *Digitalway Servs., LLC,* minimum contacts and purposeful availment are not established here.[2] Additionally, a "mere contract with a resident of the forum state is not enough on its own" because the context and activity surrounding the contract must be substantial enough to demonstrate purposeful availment of the privilege of doing business in Texas[193]—

---

[191] ROA.2939.

[192] *See Digitalway Servs., LLC v. Blue Ridge Healthcare*, 2023 U.S. Dist. LEXIS 85203, at *5 (N.D. Tex. 2023); *Walden*, 571 U.S. at 285.

[193] *See Digitalway*, 2023 U.S. Dist. LEXIS 85203, at *4; *see also Heavy Duty*, 2015 U.S. Dist. LEXIS 62252, at *12.

something that cannot be shown by an online adhesion contract such as American's "browsewrap" terms of use.

This Court's *Pervasive Software* opinion specifically rejected a Texas choice of law provision, contained in an imputed software licensing agreement, as a basis for specific personal jurisdiction.[194] In addition to the questionable enforceability of the nature of the alleged agreement, those terms "involved no prior negotiations" and "did not envision 'continuing and wide-reaching contacts' between [the parties] in Texas."[195] The same is true here. The alleged browsewrap Use Agreement was not freely negotiated between the parties and does not envision continuing and wide-reaching contacts between Skiplagged and American in Texas. It also does not require any performance by Skiplagged in Texas.

Finally, the fact that the browsewrap Use Agreement purports to unilaterally deem that "terms of the site constitute an agreement made and entered into in Tarrant County, Texas" is unavailing, for the same reasons. American cannot rely on this because the alleged acts were undertaken by Skiplagged in New York and its customers around the world. The same is true regarding the alleged acts purportedly amounting to a breach of the Use Agreement and the concomitant alleged statutory violations.

---

[194] *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 223-26 (5th Cir. 2012).
[195] *Id.* at 224.

Under *Walden* and this Court's precedent applying that case to online commerce, the record before the district court compels reversal of the denial of Skiplagged's motion to dismiss for lack of personal jurisdiction.

## II.     The district court erred in holding Skiplagged liable for copyright infringement.

American alleged that Skiplagged's use of its flight symbol with the words "American Airlines" on the Skiplagged website infringed American's copyright.[196] The district court granted summary judgment that Skiplagged was liable for copyright infringement, rejecting Skiplagged's fair use defense.[197] That ruling was erroneous because Skiplagged established fair use as a matter of law, and at a minimum, raised triable issues about it.

Fair use is a limited privilege to use copyrighted material in a reasonable manner without the owner's consent. The doctrine "balances the 'inherent tension' between copyright's interests in protecting author's works and permitting others to reference them in cultural conversation."[198] The Copyright Act identifies four factors to consider: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount/substantiality of the portion used in relation to the copyrighted

---

[196] ROA.8974-75.
[197] ROA.3826.
[198] *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 321 (5th Cir. 2022).

work as a whole, and (4) the effect of the use upon the potential market for or value of the copyrighted work.[199]

No factor is dispositive, though courts give particular weight to the first and fourth.[200] A court considers the factors in total and then weighs them against the purposes of copyright protection.[201] When, as here, the issue was resolved by summary judgment, the question whether Skiplagged's use of the flight symbol is fair use presents a question of law reviewed de novo.[202]

Here, the district court erred by rejecting Skiplagged's fair use defense without analyzing the statutory factors:

> While Skiplagged extensively briefs factors traditionally associated with the fair-use analysis, the Court need not progress its analysis that far …. [I]t is patently *not* fair use to resale another entity's tickets, while brandishing *their* logo and directing consumers to *their* information.[203]

Skiplagged does not "resell" American's flights. It provides information to a customer, and if asked to do so, facilitates a ticket purchase by the customer directly from American.[204] The district court erred at the outset by disregarding the factors based on an incorrect factual assumption.

---

[199] *Keck*, 116 F.4th at 453; 17 U.S.C. § 107.
[200] *Bell*, 27 F.4th at 321.
[201] *Id.*
[202] *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 23-25 (2021).
[203] ROA.3826 (emphasis in original).
[204] *See supra* at 16, 43-45.

And when the factors are fully and fairly reviewed, this record shows that it is quintessential fair use for Skiplagged to use the American logo to accurately identify the carrier for a particular flight as requested by a potential customer's search.

*1. Purpose and character of the use.* The "central question" of this factor is "whether the new work merely supersede[s] the objects of the original creation or instead adds something new, with a further purpose or different character."[205] If the challenged use does not diminish the "incentive to create," it is more likely to be "fair."[206]

American introduced no evidence that Skiplagged's use had an impact on the artistic development of the American logo. The only evidence about Skiplagged's use is that it used the American logo as a source identifier, to identify the airline offering a particular flight.

Because that use is referential and informational, this factor favors Skiplagged. A consumer searching for flights needs to know the carrier associated with a particular route and price. The American flight symbol universally and truthfully conveys that information for an American flight, just as a search for "cars" could identify a "Ford" or "Chevrolet."

---

[205] *Keck*, 116 F.4th at 453 (citing *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527-528 (2023)).
[206] 116 F.4th at 455.

Skiplagged's use of American's logo does not impede American's creative expression; it is used to accurately identify American flights as such. And it benefits the public by promoting price transparency and competition for air travel, identifying purchase options that may have otherwise gone undiscovered, and letting consumers make more informed purchasing decisions—all recognized benefits of the fair use of copyrighted source identifier in the closely analogous setting of search engines.[207]

The first factor favors Skiplagged.

*2. Nature of the copyrighted work.* "To determine the nature of the work, we consider whether the work has been appropriated for its 'expressive elements,' rather than to disseminate 'the underlying facts.'"[208] This factor is "widely considered" as the least important one.[209]

American's logo is a creative and stylized graphic, which favors American. However, unlike a painting or song, the value of which rests on its artistic expression, Skiplagged does not use the logo for its expressive elements. The flight symbol and name convey facts—the identity of a

---

[207] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) ("[A] search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool.").
[208] *Bell*, 27 F.4th at 323.
[209] *Id.*

flight's operator. Because copyright focuses on protecting creativity rather than functionality,[210] this factor favors Skiplagged.

*3. Amount and substantiality of the portion of the work.* Skiplagged used the entire, unaltered flight symbol to identify American's flights in search results. That was done for accurate identification, not for artistic or aesthetic reasons. Fair use permits reproduction of an entire work when functionally necessary[211] (as opposed to an art distributor copying a painting or a musician mimicking a popular song), and American did not introduce any evidence showing that Skiplagged had any aesthetic motivations for identifying American flights as such.

Given the referential nature of Skiplagged's use, this factor carries little weight.

*4. Market impact.* The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work."[212] The Supreme Court deems this "the single most important element of fair use,"[213] and it strongly favors Skiplagged. Put simply, the Copyright Act does not protect American's flight pricing model.

---

[210] *See Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1348 (5th Cir. 1994); *Alcatel*, 166 F.3d at 772, 785, 787, 787-788.

[211] *See Perfect 10*, 508 F.3d at 1165, 1167-68; *Kelly*, 336 F.3d at 821.

[212] 17 U.S.C. § 107(4).

[213] *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985).

The district court's discussion of fair use shows the importance of this factor. That court focused on American's sale of tickets, noting that: "Skiplagged significantly undermined American's profitability—even if American still profited and consumers were more the merrier."[214] But American's ability to protect its pricing model is not a copyright issue. The relevant question is whether Skiplagged's use of the American flight logo affected the market for *that logo*.

American offered no evidence about that market,[215] and in fact, said that it would never consider licensing its logo to sell hidden-city fares.[216] This Court's recent *Keck* opinion holds that a copyright owner cannot lose a licensing opportunity that it would never offer.[217] And if there were such a market, Skiplagged's use could not undermine demand for American's logo because Skiplagged's product—the service of publishing flight information —is not a substitute for the logo. Skiplagged merely uses the logo to identify flights that American operated.

This Court's 2024 opinion in *Keck v. Mix Creative Learning Ctr., L.L.C.*[218] reviews fair use in a case with a similar balance of the factors. An art studio, Mix Creative, duplicated an artist's decorative dog paintings and

---

[214] ROA.3826.
[215] *See infra* at 9144-9201.
[216] ROA.9148-51.
[217] *Keck*, 116 F.4th 448 at 454.
[218] *Id.*

included them in "kits" sold to children for educational purposes. The artist sued for copyright infringement, and this Court held that Mix's duplication of the paintings was fair use.

*Keck*'s analysis of the first and fourth factors is particularly instructive. As to the first factor (purpose and character of the use), the court observed that the purpose of the secondary use—art education for children—differed from the original aesthetic purpose of providing creative expression for the public's enjoyment. Because Mix Creative's purpose in utilizing the copyrighted work was fundamentally different, the kits were not serving as a market substitute for the original paintings.

And as to the fourth factor (effect on the market for the protected material), *Keck* found no harm to the market for the artist's paintings, again because the purpose of the art studio's use—art education for children— was fundamentally different that the aesthetic and expressive purpose served by the original paintings. This analysis further supports the conclusion that fair use bars American's copyright claim.

Skiplagged established fair use of America's copyrighted flight logo; at a minimum, it presented triable issues on that question.

### III. American offered no evidence of damages for the relevant three-year period.

"Under the [Copyright] Act's three-year provision, an infringement is actionable within three years, and only three years, of its occurrence."[219] Therefore, "Plaintiff's damages are limited to the three years before [it] filed this lawsuit."[220]

American's damages expert, David Fuller, used a look-back period of *four years* to calculate American's lost profits as $19.9 million and Skiplagged's profits as $24.7 million.[221] He gave no opinion on American's damages or Skiplagged's profits for the three-year period that is relevant to a copyright claim, or any opinion about damage for any individual year. He did not even mention the word "copyright" in his testimony.[222] His opinion was about a four-year lump sum, and nothing else (likely chosen because that is the applicable period for trademark damages.)

In the Second Circuit case of *Annis v. County of Westchester*, a civil-rights plaintiff claimed damages from a series of events, many outside the relevant time period.[223] The court held: "When it is not possible to

---

[219] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 672 (2014).
[220] *Johnston v. Kroeger*, No. 1:20-cv-00497-RP, 2022 WL 3703859, at *4 (W.D. Tex. Aug. 26, 2022); *see also Ramirez v. Freddie Records, Inc.*, No. H-08-801, 2009 WL 10694831, at *5 (S.D. Tex. Sept. 10, 2009) ("Plaintiffs may recover damages for acts occurring within the three years preceding the filing of their suit.").
[221] ROA.9371; *see also* ROA.9367, ROA.9382.
[222] *See* ROA.9357-94049405.
[223] 136 F.3d 239, 248 (2d Cir. 1998).

ascertain what portions of the compensatory and punitive damages awards were attributable to claims that were time-barred, the damages awards must be vacated."[224]

That reasoning should control here. For its trial strategy, American presented only a trademark-focused damages model about a lump sum for a four-year period. When American made that choice, it gave the jury no basis to award copyright damages, which require a three-year period. American should take nothing on its copyright claim.

## IV. American did not connect its claimed damages to the one act of copyright infringement that it alleged.

Under the Copyright Act, "[t]he copyright owner is entitled to recover [1] the actual damages suffered by him or her *as a result* of the infringement, and [2] any profits of the infringer that *are attributable to* the infringement and are not taken into account in computing the actual damages."[225] Both types of damage require the copyright owner to prove a causal link to the alleged copyright infringement.

In this case, the only alleged act of copyright infringement is Skiplagged's display of American's flight symbol on the Skiplagged website.[226] The merits of hidden-city ticketing are not a copyright issue

---

[224] *Id.* (quoting *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 485 (3d Cir. 1997) (reaching similar conclusion in a case involving a series of allegedly harassing events).
[225] 17 U.S.C. § 504(b) (internal numbering and emphasis added).
[226] ROA.(pleading); ROA.13806 (summary judgment); AOB at 4-58932.

because ticket prices cannot be copyrighted. And alleged confusion about the American brand is a trademark issue and not a copyright claim.

The act of copyright infringement alleged by American has no causal connection to any of its claimed damages. While disgorgement is the second damage remedy created by the statute, Skiplagged will start with it because the relevant law is more developed in that area. American's lost-profit claims then fail for the same reasons.

When reviewing the denial of a motion for judgment as a matter of law, this Court "'consider[s] all of the evidence—not just that evidence which supports the non-mover's case … in the light and with all reasonable inferences most favorable to the party opposed to the motion.'"[227] While that standard is deferential, a verdict based upon deficient evidence cannot stand when the plaintiff's evidence is inadequate as a matter of law.[228]

### A. American did not prove a causal connection between the alleged act of copyright infringement and any Skiplagged profits.

To establish a right to profit disgorgement, a copyright owner is only "required to present proof only of the infringer's gross revenue," which then shifts the burden to the defendant to establish the corresponding

---

[227] *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011).
[228] *See PAR Microsystems, Inc. v. Pinnacle Devel. Corp.*, 995 F.Supp. 658, 660 (N.D. Tex. 1998).

costs.[229] But, consistent with the statute's causation requirements, "gross revenue" is consistently defined by courts as "revenue *reasonably related* to the infringement."[230] As a result, absent a causal connection between the defendant's revenue and alleged infringement, disgorgement fails at the first step.

The cases about disgorgement distinguish between "direct" and "indirect" profits. A direct-profit case is presented when the defendant passes off fake goods as authentic—for example, selling fake Rolex watches as genuine ones. An indirect profits case arises when the "defendant[] [is] alleged to have used a copyright to sell other products."[231] This case is an indirect profits case, because American claims that Skiplagged used the copyrighted flight symbol to sell Skiplagged's website services, and thus obtain the service fee for ticket sales.

In an indirect profits case, "[a] copyright holder must proffer sufficient nonspeculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement"—a "causal nexus," not "some non-causal connection."[232]

---

[229] 17 U.S.C. § 504(b).
[230] *MGE UPS Systems, Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361, 367 (5th Cir. 2010).
[231] *Straus v. DVC Worldwide, Inc.,* 484 F.Supp. 2d 620, 645 (S.D. Tex. 2007).
[232] *Graham v. Prince,* No. 15-CV-10160 (SHS), 2023 WL 5917712, at *5 (S.D.N.Y. Sept. 11, 2023).

American's expert failed to do so. He started "by looking at the amount of loss that American incurred, in terms of receiving less revenue for the sales of these tickets than they would have received if they had sold them."[233] In other words, he assumed that everyone who bought hidden-city tickets from American would have paid American more for American tickets to the same place, if Skiplagged had not provided the hidden-city route information.[234] He then calculated American's lost profits as the difference between the fare for those flights,[235] and Skiplagged's profits as the fees earned as to those ticket sales[236]—without ever saying "copyright" or alleging any harm to the value of a copyright.[237]

That calculation does not satisfy American's burden to prove causation. To start with, the expert did nothing to confirm that, absent Skiplagged providing information about American hidden-city routes and prices, American would have sold another ticket to the same destination at

---

[233] ROA.9374.

[234] *See* ROA.9380; see also ROA.9584 (Skiplagged's expert: "The big [assumption] was that everyone who purchased a hidden-city ticket would have instead purchased a full fare ticket.").

[235] ROA.9381.

[236] ROA.9386.

[237] ROA.9400 ("I didn't reduce the 100% by any factor for those decisions that people might make that would cause the percentage to be some number less than 100%."); ROA.7741 (Skiplagged's expert on this point).

a higher price.[238] Moreover, he did nothing to connect any American sales involving Skiplagged to Skiplagged's use of the American symbol.[239]

No other witness filled the gap. American's corporate representative, Marcial Lapp, did not testify about any copyright infringement harm. To the contrary, he confirmed that American's main objective was to "stop Skiplagged from selling American Airlines tickets, very simple."[240] Likewise, American's other expert witness, Dr. Jerry Wind, only testified about his research "on the likelihood of consumer confusion between Skiplagged and American Airlines"[241]—an issue of trademark rather than copyright.[242]

That's not surprising, because American's disagreement with Skiplagged isn't about copyright. It's about Skiplagged's facilitation of consumer purchases of hidden-city tickets, as its counsel argued:

> Skiplagged's business has a lure or bait to consumers of what they call loophole tickets. … They—Skiplagged says, they find flights that airlines don't want you to see. We're exposing loopholes in airfare pricing to save you money. They say we'll find "Ridiculous travel deals." The problem, ladies and

---

[238] *See* ROA.9585.

[239] ROA.9401 ("Q. But you did no analysis as to whether American could resell that seat, did you? A. I didn't perform an analysis. …").

[240] ROA.9550.

[241] ROA.9083; *see also id.* ROA.9118

[242] *See Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 476 F.App'x 190, 192 (11th Cir. 2012).

> gentlemen, is that *these deals are prohibited by American* and almost every other airline in the country ....[243]

In other words, American complains that Skiplagged undermined its profitable hub-and-spoke pricing model—something that cannot be copyrighted. And courts consistently refuse to sanction the use of copyright law to restrain competition with the holder generally; instead, its protection extends only to the copyrighted material itself.[244]

American's lack of causation evidence is particularly problematic on this record, which includes evidence about obvious alternative influences on customers, unrelated to the logo, such as significantly lower prices for hidden-city routes, the ease of seeing multiple flights from different carriers at once, Skiplagged's rewards program, and the flight time and date.[245] Skiplagged's website even showed the higher-priced American routes using the same flight symbol.[246]

The most relevant case from this Court is *Vane v. The Fair, Inc.*, which affirmed the exclusion of an expert who did not tie the plaintiff's claimed damages to the specific slides in a marketing presentation that

---

[243] ROA.8903 (emphasis added); *see also, e.g.,* ROA.9549 ("I'm not disputing that we are getting bookings today from Skiplagged. What I'm concerned about, or what I take issue with is that these bookings, again, violate our rulings of how bookings should be made on American Airlines.").

[244] *See Google*, 593 U.S. at 39-40.

[245] ROA.9578-79, ROA.9610, ROA.9630.

[246] ROA.10249-384 (PX23 & 24).

contained allegedly copyrighted information. [247] More generally, this Court holds that "a necessary ingredient" of valid expert analysis is "exclusion of alternative causes," especially when "evidence gives rise to numerous inferences which are equally plausible, yet only one inference is consistent with the plaintiff's theory …." [248] Mr. Fuller failed to do so.

Recent authority from other jurisdictions also supports Skiplagged's position. A widely cited case is *Mackie v. Rieser*, where the Ninth Circuit considered an indirect-damages claim about a 24-page brochure used by the Seattle Symphony to promote concerts, in which page 12 had an unauthorized picture of a copyrighted work by a local artist. The court found no evidence of causation:

> [W]e can surmise *virtually endless permutations* to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question. For example, was it because of the Symphony's reputation, or the conductor, or a specific musician, or the dates of the concerts, or the new symphony hall, or the program, or the featured composers, or community boosterism, or simply a love of music, or … ? [249]

Other cases also reject damages based solely on the fact that sales were made after contact with marketing material containing allegedly

[247] 849 F.2d 186, 189-90 (5th Cir. 1988).
[248] *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000).
[249] 296 F.3d 909, 916 (9th Cir. 2002) (emphasis added).

infringing material[250]—specifically including a website.[251] A claimed "air of legitimacy" from including a copyrighted image also fails to prove causation.[252] Similar holdings are legion.[253] All compel reversal.

### B. American did not prove a causal connection between the alleged act of copyright infringement and any American lost profits.

To establish lost-profits damages for alleged copyright infringement, the plaintiff "bears the burden of proving that the infringement was the cause of its loss of revenue."[254] To do so, "[t]he plaintiff should first establish that the infringement was the cause-in-fact of its loss by showing with reasonable probability that, *but for the defendant's infringement*, the plaintiff would not have suffered the loss."[255] Then, "[t]he plaintiff must also prove that the infringement was a proximate cause of its loss by

---

[250] *SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*, 681 F.Supp.3d 1181, 1219-20 (D. Utah 2023) ("[T]he Design Manual is ninety pages [and] it is not clear which parts of the Design Manual were influential to any given decision maker.").

[251] *See Apulent, Ltd. v. Jewel Hospitality, Inc.*, No. C14–637RSL, 2015 WL 630953, at *7 (W.D. Wash. Feb. 12, 2025) ("While a damages expert retained by plaintiff in this case asserted that photographs of a venue 'have an impact on sales' … plaintiff has provided no concrete evidence linking the two [copyrighted] Images to sales.").

[252] *Leonard v. Stemtech Health Sci., Inc.*, No. 08–067–LPS–CJB, 2011 WL 6046701, at *22 (D. Del. Dec. 5, 2011) ("Mere conceivability, however, is not enough.").

[253] *See I Dig Texas, LLC v. Creager*, 498 F.4th 998, 1008 (10th Cir. 2024); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir. 2004); *Del Amo v. Baccash*, No. CV 07-663 PSG (JWJx), 2008 WL 2780978, at *6 (C.D. Cal. July 15, 2008).

[254] *PAR Microsystems, Inc. v. Pinnacle Development Corp.*, 995 F.Supp. 658, 660 (N.D. Tex. 1998) (citations omitted) (emphasis added) (cleaned up).

[255] *PAR*, 995 F.Supp. at 660.

demonstrating that the existence and amount of the loss was a natural and probable consequence of the infringement."[256]

"But for" and "proximate" causation are well-known "principles of tort law, to which copyright is often analogized."[257] They set a more demanding standard than what is required for indirect damages, where only a "causal nexus" is needed.[258] Because American could not satisfy that lower standard, it necessarily cannot satisfy the "but for" standard required to recover lost profits.

The Northern District of Texas case of *PAR Microsystems v. Pinnacle Development* applies causation principles to a lost-profits claim. The plaintiff sued for software copyright infringement and calculated its damages "by measuring lost profits based on the sales that it contends it would have made…had it been able to sell the product…"[259] The jury awarded millions of dollars, and Judge Fitzwater rendered judgment notwithstanding the verdict, finding that the plaintiff failed to show that it lost sales due to the defendant's infringement, and thus failed to prove proximate cause as the statute requires.[260]

---

[256] *Id.*
[257] *Mackie*, 296 F.3d at 915.
[258] *See supra* at 77-81.
[259] *PAR*, 995 F.Supp. at 661.
[260] *PAR*, 995 F.Supp. at 661.

The same result is proper here, given the lack of any evidence that connects the alleged infringement of the flight logo to the claimed lost profits—coupled with undisputed evidence that American earned over $200 million in revenue on flights facilitated by Skiplagged.[261]

## C. The judgment contains impermissible double counting.

To recover both actual damages and disgorgement, a copyright plaintiff must prove the defendant's profits are "not taken into account in computing the actual damages."[262] American did not meet that burden. It provided no evidence to distinguish actual damages and disgorged profits. To the contrary, the judgment awards American the same amount for actual damages and disgorged profits,[263] strongly signaling that the two numbers represent the same recovery.

The verdict also suggests double counting. For American's actual damages (Question 1), the jury awarded $19 million.[264] On Question 3, the jury found that American failed to mitigate its damages by $14.3M.[265] Then, on Question 4 about Skiplagged's profits, the jury answered

---

[261] ROA.9547.

[262] 17 U.S.C. § 504(b); *see also Leland Med. Centers, Inc. v. Weiss,* No. 4:07CV67, 2007 WL 2900599, at *7 (E.D. Tex. Sept. 28, 2007) ("If these profits are part and parcel of his disgorged profit analysis, then [plaintiff] is to some extent 'double dipping' on the damages … doing exactly what 17 U.S.C. Section 504(b) proscribes.").

[263] ROA.8544–50, ROA.8631-48 (judgment), ROA.7984-85 (verdict).

[264] ROA.7984.

[265] ROA.7984.

$4.7M[266]—a number obviously reached by subtracting $14.3M from $19M. These answers suggest that the jury thought Question 4 asked it to calculate actual damages net of American's failure to mitigate, and not a new question about disgorgement.

The jury appears to have inadvertently doubled the total damages award, without engaging in a true disgorgement analysis, and that error was carried forward into the judgment.

## Conclusion

Skiplagged respectfully asks this Court to dismiss for lack of personal jurisdiction, or otherwise affirm the district court's on the matters challenged by American, and reverse and render judgment as requested by Skiplagged in its cross-appeal, or remand as may be appropriate, while granting Skiplagged all other relief to which it is justly entitled, consistent with such dispositions.

---

[266] ROA.7985.

Respectfully submitted,

Aaron Z. Tobin
  Texas Bar No. 24028045
   atobin@condontobn.com
Brandy R. Manning
  Texas Bar No. 24029703
   bmanning@condontobn.com
**Condon Tobin Sladek Thornton**
**Nerenbeg, PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
P: 214-265-3800
F: 214- 691-6311

*/s/ David S. Coale*
David S. Coale
  Texas Bar No. 0078725
   dcoale@lynnllp.com
**Lynn Pinker Hurst &**
**Schwegmann, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
P: 214-981-3800
F: 214-981-3839

*Attorneys for Skiplagged, Inc.*

# Certificate of Service

The undersigned hereby certifies that on March 2, 2026, the foregoing brief was electronically filed with the Clerk for the United States Court of Appeals for the Fifth Circuit, and that all counsel of record were served by electronic means on that same date:

Dee J. Kelly, Jr.
Caitlyn E. Hubbard
Julia G. Wisenberg
**Kelly Hart & Hallman LLP**

R. Paul Yetter
Tyler P. Young
**Yetter Coleman LLP**

Cameron M. Nelson
**Greenberg Traurig LLP**

*/s/ David S. Coale*
David S. Coale

# Certificate of Compliance

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 15,296 words, excluding the parts of the Brief specifically exempted by Fed R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a conventional typeface using Microsoft Word in Equity A 14-point for text; 12-point for footnotes.

Date: March 2, 2026.

*/s/ David S. Coale*
David S. Coale

## Certificate of Electronic Compliance

I hereby certify that, in the foregoing motion filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by the Fifth Circuit Rule 25.2.13 have been made, (2) the electronic submission is an exact copy of the paper document, and (3) the document has been scanned for viruses and is free of viruses.

*/s/ David S. Coale*
David S. Coale